**CAPITOL–HUSTING COMPANY, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1116.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1981.

Decided Feb. 16, 1982.

Donald F. Peters, Jr., Law Office of Sidney R. Korshak, Chicago, Ill., for petitioner.

James D. Donathen, N.L.R.B., Washington, D. C., for respondent.

Before CUMMINGS, Chief Circuit Judge, SPRECHER, Circuit Judge, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

This case comes before this court upon the petition of Capitol-Husting Company, Inc. (hereinafter "Capitol"), to review and set aside an order of the National Labor Relations Board (hereinafter "the Board") issued on September 9, 1980 (252 N.L.R.B. No. 9), and upon the cross-application of the Board for enforcement of that order. The Board found Capitol in violation of §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act (hereinafter "Act"), 29 U.S.C. § 158(a)(1) and (5),[1] by reneging on an agreement to match the provisions of a contract the Union had reached with another company and by unilaterally changing the health insurance and pension plans for employees who had initially joined a strike but later returned to work.

## Background

Capitol is a Wisconsin corporation engaged in the wholesale of liquor and other related products. It employs approximately 14 employees. The Union, Teamsters, Local 344, Sales and Service Industry affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, is the recognized bargaining representative of Capitol's employees.

Prior to 1974, Capitol had negotiated with the Union as a member of a multi-employer association. Two members of this association, Metropolitan Liquor Company and Edison Liquor Company, were competitors of Capitol. The association disbanded in 1974 and since that time, the Union has bargained and negotiated contracts with the former members on an individual basis. Capitol signed its initial contract with the Union in 1974 for a three-year term and in 1977 negotiated a second contract with the Union which extended the previous contract for one year. This second contract expired on August 1, 1978.

In a letter dated June 20, 1978, the Union requested that Capitol commence bargaining for a new contract. Included with the letter was the Union's initial set of bargaining demands. Similar bargaining requests were made of Metropolitan and Edison. The first meeting between Capitol and the Union took place on July 17, 1978. Representing the Union were Carl H. Maahs, the Union's Business Representative, Robert H. Biel, the Union Steward, and Philip Schwab, a member of the bargaining committee. Representing Capitol were James Alevizos, President, and Gregory Alevizos, Vice-President. During the course of this meeting, James Alevizos expressed a reluctancy to be the first among Metropolitan, Edison and Capitol to agree on a new contract. Alevizos felt the delicate competitive balance which existed between Capitol and the other two companies might be threatened should Capitol be the first to reach an

---

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

1. Section 8 of the National Labor Relations Act provides in pertinent part:

(a) It shall be an unfair labor practice for an employer

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7;

\* \* \* \* \* \*

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a).

agreement and later discover that Metropolitan or Edison negotiated more advantageous agreements. In light of this concern, he responded to the Union's demands by offering to extend the existing contract for an additional year. Maahs and Biel testified that after further discussion, Alevizos stated that if "Metropolitan or Edison give anything, [Capitol] will give the same." Although the Union did not express any formal acceptance to this offer, it did firmly rely upon it by ending the meeting and directing all of its efforts exclusively toward reaching an agreement with Metropolitan or Edison.

Not achieving any success in its negotiations with Metropolitan or Edison, the Union met briefly with Capitol on September 6, 1978. At this meeting, Maahs expressed a willingness to make some movement if Capitol would do the same. James Ballsieper, Capitol's Comptroller and principal spokesman at this meeting, merely offered to extend the existing contract for another year. There was no discussion or even mention of Capitol's July 17 offer to match.

A third meeting took place on November 2, 1978, at the behest of a federal mediator. Metropolitan and Edison were in attendance in addition to Capitol and the Union. The purpose of this meeting was to break the stalemate which existed in all of the separate negotiations. No progress was made. As of September 6, there was no discussion or mention of Capitol's July 17 offer to match.

Shortly after the November 2 meeting, the Union struck Metropolitan. This action resulted in productive negotiations between those two parties which culminated in an agreement being reached on November 8, 1978. The two-year contract provided for a 70 cent an hour retroactive wage increase, a wage "reopener" at the end of the first year and a $4 per week additional contribution by Metropolitan to the pension fund in the second year. The contract was ratified by Metropolitan employees on November 8.[2]

On November 9, 1978, the Union met with and informed Capitol of the Metropolitan agreement. Maahs called upon President Alevizos to honor his July 17 agreement to match. Alevizos refused and offered only to extend the existing contract for an additional year. Never expressly denying that he had agreed to match, he claimed that adopting the Metropolitan contract would be "economic suicide." The meeting concluded with this dispute. Subsequent telephone conversations between the Union and Capitol failed to resolve the conflict.

On approximately November 14, 1978, the Union struck Capitol in support of its bargaining demand that Capitol fulfill its agreement to match the Metropolitan contract. Capitol responded by hiring eleven permanent replacements. Additionally, three strikers returned to work. On or about the date the strike commenced, Capitol unilaterally changed the employees' health insurance and pension plans and replaced them with plans of approximately equivalent value. Further attempts to resolve the labor dispute proved fruitless.

## NLRB Proceedings

On December 7, 1978, the Union filed an unfair labor practice charge alleging that Capitol violated §§ 8(a)(1) and (5) by failing to enter into an agreement which included the provisions of the Metropolitan-Union contract and by unilaterally changing the health insurance and pension plans for the replacements and returning strikers. A complaint was issued on March 16, 1979, with a hearing being held on July 9, 1979.

In a decision issued January 28, 1980, Administrative Law Judge Karl Buschmann found that: (1) by agreeing on July 17, 1978, to match any proposal which the Union could obtain from Metropolitan Liquor Company or another liquor company and, when confronted by the Union with such a proposal on November 9, 1978, by reneging on its agreement, Capitol refused to bargain in good faith, in violation of

---

2. Notice of ratification was apparently not given to Metropolitan until November 27, 1978.

The actual signing of the agreement did not take place until June, 1979.

§§ 8(a)(5) and (1) of the Act, and (2) by unilaterally changing the health insurance plans and pension plans for its employees at the commencement of their strike, Capitol violated §§ 8(a)(5) and (1) of the Act. Having found these violations, the ALJ recommended the following remedies:

> Realizing that Respondent's pledge to the Union to match the offer of Metropolitan or Edison Liquor was generally limited to the economic portion of the contract, and having found that this amounted to "seventy cent an hour increase across the board the first year of the contract, a wage reopener on the second year of the contract and four dollars additional on the pension the second year of the contract," I recommend that Capitol-Husting be ordered to furnish the Union with a complete draft contract containing the above stated wage proposal and Respondent's proposal on all other unresolved items.

> Having further found that Respondent violated Section 8(a)(5) and (1) by its unilateral change in health insurance and pension plans, I recommend that Respondent be ordered to bargain collectively and in good faith with the Union concerning these items for all its unit employees, as defined in the expired 1977–1978 contract.

On September 9, 1980, a three-member panel of the NLRB affirmed the findings, conclusions and recommended remedies of the ALJ with only minor modification.[3]

### Refusal to Adopt the Metropolitan Contract

The opinion of the ALJ does not make entirely clear whether the basis of his decision was that an agreement to match was reached on July 17, or whether only an offer to match was made but which was not validly withdrawn before formal acceptance by the Union on November 9, 1978. ALJ Buschmann appears to have reached his de-

cision based upon alternative holdings. For this reason, we shall examine each separately.

The principal dispute throughout the proceedings before the Board as well as this court concerns the correct characterization of the negotiations conducted between Capitol and the Union on July 17, 1978. The ALJ concluded that an agreement to match was reached.

> Considering the negotiations in their entirety and the record testimony, I find that an effective agreement resulted which Respondent repudiated. Maahs' testimony, albeit vague in part, was unequivocal that Alevizos had made a pledge to match any offer of its two competitors. It is also clear that the Union firmly relied upon this commitment by Respondent. Maahs' testimony was fully substantiated by Biel who had been employed by Respondent for many years but who was working elsewhere at the time of the trial in this matter. Further corroboration of the July 17 agreement is found in the minutes which had been taken by Maahs on the same day. Respondent's witnesses, James and Greg Alevizos, denied that they had expressed a promise to match what either Metropolitan or Edison would give, but they did admit to a meeting on that day which dealt with various proposals and their concern about being the first to enter into an agreement. James Alevizos also admitted that Maahs expected them at the November 9th meeting to match Metropolitan's agreement. Further, unrefuted on the record is Maahs' testimony that the success of reaching an agreement with Metropolitan was primarily based upon his representation that Capitol-Husting would match that agreement. I therefore credit Maahs' testimony in this regard and I am convinced that James Alevizos expressed to the Union his com-

---

**3.** That modification of the ALJ's decision entered by the Board concerned testimony by Maahs describing the discussions between himself and Robert Martin during the Union's negotiations with Metropolitan. The Board found

it unnecessary to rely on this testimony in affirming the ALJ's decision. We too find it unnecessary and do not reach Capitol's hearsay arguments on this point.

mitment to match the financial package which Metropolitan or Edison would agree to.[4]

Capitol challenges this finding and contends that the meeting produced only an offer to match with no expression of acceptance by the Union. It argues that the only manifestation of acceptance by the Union was on November 9, 1978, by express assent. Prior to that time, however, the offer to match had been validly withdrawn. Without an acceptance, either express or implied, there was simply no agreement reached on July 17, 1978, and, without an outstanding offer, there was nothing the Union could accept on November 9, 1978. Therefore, the initial issue before this court becomes whether the finding that an agreement to match was reached on July 17 is adequately supported by the administrative record.

■■ Reasoned flexibility in the application of contract law to the field of labor relations is necessary to fully effectuate the policies underlying federal labor law. *See N.L.R.B. v. Electra-Food Machinery, Inc.*, 621 F.2d 956, 958 (9th Cir. 1980); *Lozano Enterprises v. N.L.R.B.*, 327 F.2d 814, 818–19 (9th Cir. 1964). The Supreme Court has recognized that "a collective bargaining agreement is not an ordinary contract." *John Wiley & Sons v. Livingston*, 376 U.S. 543, 550, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964). *See also Lodge 1327, Int. Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Fraser & Johnston Company*, 454 F.2d 88, 92 (9th Cir. 1971). In *Pepsi-Cola Bottling Co. v. N.L.R.B.*, 659 F.2d 87, 89 (8th Cir. 1981), the court discussed why common law contract rules do not exclusively govern the collective bargaining setting.

In a private commercial setting, the parties voluntarily contract with each other. Traditional contract law therefore provides that an offer terminates if rejected by the offeree, thus allowing the offering party free to strike a bargain elsewhere, with no danger of being bound to more than one contract. In contrast, the National Labor Relations Act compels the employer and the duly certified union to deal with each other and to bargain in good faith. Upon rejection of an offer, the offeror may not seek another contracting party. As explained by the Supreme Court, "The choice is generally not between entering or refusing to enter into a relationship, for that in all probability preexists the negotiations." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1959).

In *F. W. Means & Co. v. N.L.R.B.*, 377 F.2d 683 (7th Cir. 1967), this court held that although the technical rules comprising contract law do not necessarily control all decisions in labor-management cases, the normal rules of offer and acceptance are generally determinative of the existence of a collective bargaining agreement. *Accord, Lozano Enterprises*, 327 F.2d at 819. We also find helpful to our reviewing task the analysis provided by the Court of Appeals for the Ninth Circuit in *N.L.R.B. v. Donkin's Inn, Inc.*, 532 F.2d 138, 141 (9th Cir.), *cert. denied*, 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976):

In the context of labor disputes, and particularly section 8(a)(5) violations, however, the technical question of whether a contract was accepted in the traditional sense is perhaps less vital than it otherwise would be. Rather, a more crucial inquiry is whether the two sides have reached an "agreement," even though that "agreement" might fall short of the technical requirements of an accepted contract.

■ It is very clear from the record that at the July 17 meeting Capitol did make an unconditional offer to match and the Union failed to expressly accept this offer. The

---

**4.** The ALJ also concluded that Capitol's offer to extend the existing contract an additional year was, in the absence of a lawful impasse or other unusual circumstances, no offer at all since it was already prescribed from making any unilateral changes in the existing relationship. At oral argument and in its brief, Capitol contends this conclusion is erroneous. For purposes of this appeal, this court need not address this question.

Union's failure, however, even under basic contract law, does not preclude the finding of an acceptance. There is substantial evidence to support a finding that the Union's acceptance can be inferred from its conduct following the making of the offer. This includes the relatively abrupt termination of negotiations and the failure to discuss dates for future meetings and proposed agendas. Under the circumstances surrounding the July 17 negotiations, especially the grave concern President Alevizos expressed about being the first in the industry to enter into an agreement, a reasonable person in the position of Alevizos would have understood that the Union had expressed its assent to Capitol's offer to match. Although we admit that this is a close factual question, we cannot declare the Board's finding of an agreement erroneous under our substantial evidence standard of review.

In addition, there is substantial evidence to support a finding that the Union acted reasonably in relying on that offer by postponing further negotiations with Capitol and directing all of its negotiating efforts towards Metropolitan and Edison. The Union was led to believe that a separate contract with Capitol at that time was impossible based upon Alevizos' competitive balance representations. Capitol should have been fully aware of the impact its offer to match might have on its negotiations with the Union. Indeed, approximately fifty days elapsed from the date of the offer to match until the next meeting between Capitol and the Union. During that period, the existing contract expired. Absent the offer to match and the Union's justified understanding of its existence, it is quite probable that further negotiations between Capitol and the Union would have been scheduled sometime during the fifty day period. The Union did detrimentally rely upon Capitol's offer to match and Capitol benefited as the existing contract remained in effect. At the very least, bad faith would be a fair characterization of Capitol's conduct in permitting the Union to leave the meeting with the understanding that there was an agreement to match if there was none.

Whether or not an agreement has been reached between two parties is a question of fact for the Board to determine. *N.L.R.B. v. Truck Drivers, Etc., Union No. 100*, 532 F.2d 569, 571 (6th Cir.), *cert. denied*, 429 U.S. 859, 97 S.Ct. 160, 50 L.Ed.2d 137 (1976). Moreover, it is well established that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound. *N.L.R.B. v. Haberman Construction Co.*, 641 F.2d 351, 355–56 (5th Cir. 1981) (en banc). All that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement. *Id.* at 356. And an order of the Board will be enforced by this court if there is substantial evidence on the record as a whole supporting it. *Atlas Metal Parts Co., Inc.*, 660 F.2d 304, 307 (7th Cir. 1981); *N.L.R.B. v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 750 (7th Cir. 1981); *N.L.R.B. v. Truck Drivers, Oil Drivers, Etc.*, 630 F.2d 505, 507 (7th Cir. 1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981). Based on all of the evidence discussed earlier, we conclude that the finding of an agreement on July 17 is well supported by substantial evidence in the record.

Capitol also argues that regardless of whether the July 17 negotiations are characterized as an offer to match or an agreement to match, events subsequent to that date revoked or rescinded whatever obligations may have arisen that day. This argument has no merit to the finding of the agreement to match in this case which we have just concluded is sufficiently supported by the record. The mere fact that the Union met with Capitol subsequent to the July 17 agreement did not alter the contractual obligation of either party. The content of those meetings also lends little support to a claim that the July 17 contract was rescinded.

Even assuming as correct Capitol's position that nothing more than an offer to match evolved out of the July 17 meeting, we continue to find no merit in Capitol's position that its offer was effectively with-

drawn. Capitol points to four unrefuted facts in the record in support of its argument. First, the Union participated in two negotiating sessions subsequent to the July 17 meeting. Second, in at least one of those sessions the Union expressed a willingness to compromise in order to achieve an agreement. Third, Capitol's only offer at these sessions was to extend the existing contract for an additional year. Fourth, no mention was made at any of the sessions of the offer to match. Capitol contends that all of these circumstances represent an inconsistency in the Union's argument that an outstanding offer to match remained viable and subject to acceptance as late as November 9, 1978.

■ With respect to this withdrawal argument, we find instructive the decision in *Pepsi-Cola Bottling Co. v. N.L.R.B.*, 659 F.2d 87 (8th Cir. 1981). The court there held that an offer, once made, remains on the bargaining table unless explicitly withdrawn by the offeror or unless circumstances arise which would lead the parties to reasonably believe that the offer had been withdrawn.[5] In this case, Capitol never explicitly withdrew its offer to match. Its position under the *Pepsi-Cola* standard is that based on the four unrefuted facts above, the Union should have reasonably believed that the offer to match had been withdrawn. We disagree.

■ This argument was considered and rejected by the ALJ.

The fact that subsequent meetings were held during which Respondent merely agreed to extend their contract for 1 year did not revoke or interfere with this understanding, considering the realities of the bargaining process. The Union simply attempted to obtain a contract from any of the three companies, and since it had been unsuccessful for a period of time with Metropolitan or Edi-

son, it continued its efforts with Respondent in an attempt to break the deadlock.... Accordingly, the Union was justified in relying upon Respondent's offer. And, when on November 8th, it had obtained and ratified a contract with Metropolitan and so informed Respondent on November 9th, a binding obligation arose requiring Respondent to execute or finalize the same agreement with the Union. Respondent's refusal to do so amounted to a failure to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act. *The Walls and Ceiling Contractors Ass'n*, 233 NLRB 954 (1977) [*enf'd* 619 F.2d 585 (6th Cir. 1980)]. Any different conclusion would not only be unfair to the Union and the employees, but also to Metropolitan which had relied upon Respondent's expressed commitment to the Union negotiator.

By continuing to seek an agreement through direct negotiations with Capitol, and by expressing a willingness to compromise, the Union was not acting inconsistently with the outstanding offer to match. The Union was in the bargaining position of having two routes to reach an agreement with Capitol. First, by reaching an agreement with Metropolitan or Edison and then accepting the offer to match. Second, by reaching a separate agreement with Capitol and bypassing the offer to match. Reliance on one route did not preclude the Union from concurrently pursuing the other. Its willingness to reinstitute direct negotiations with Capitol and the content of those negotiations were not in anyway inconsistent with the outstanding offer to match, especially in view of the stalemates which existed in the other negotiations. The Union simply took full advantage of the excellent bargaining position it possessed.

5. In *Pepsi-Cola*, the court concluded that an unconditional offer remains open to acceptance even after the other party has rejected the offer or submitted a counterproposal. Although we view with favor the standard employed by the Eighth Circuit for determining whether an offer has been effectively withdrawn in the collective bargaining setting, we intimate no opinion concerning that court's application of the standard where an offer has been rejected. We do not address that question inasmuch as the Union here never rejected Capitol's offer to match. There is also no indication from the record whether the Union submitted any counterproposals subsequent to the July 17 meeting.

Nor does Capitol's one year extension offer at the meetings subsequent to July 17 support its position that the Union should have reasonably understood that its earlier offer to match had been withdrawn. The underlying argument is that the offer to extend was inconsistent with the offer to match, thereby impliedly withdrawing the latter. That simply is not true. Just as the Union had two routes to reach an agreement, so too did Capitol. It had the right to pursue either or both routes in an attempt to achieve a collective bargaining agreement. The two routes were not mutually exclusive and by making the offer to match, Capitol was not precluded from negotiating separately with the Union. Capitol was perfectly justified in seeking its own agreement with the Union and not be bound by the provisions of the Metropolitan contract. Negotiating separately with the Union did not extinguish Capitol's offer to match and the Union reasonably understood that. Although it is true that the Union failed to mention the offer to match at any post-July 17 negotiating session, it is also true that Capitol failed to make any mention of its believed withdrawal. Its attempt to rely on an implied withdrawal is ineffective under these circumstances and the inherent nature of collective bargaining. Once an offer is formally placed on the table, reliance on an implied withdrawal poses real danger. It is also interesting to note that when, on November 9, 1978, the Union met with Capitol to inform it of the Metropolitan contract, President Alevizos did not reply by denying the existence of the offer but rather expressed strong dissatisfaction with the terms of that contract. This is not the reaction one would expect from Alevizos had he believed his offer had in fact been withdrawn.

For all of these reasons, we conclude that there was nothing to lead the Union to reasonably believe that the offer to match had been withdrawn. There is substantial evidence to support the finding that the July 17 offer to match remained viable at the time of the November 9 acceptance. Thus, we affirm the Board's finding that Capitol violated §§ 8(a)(1) and (5) of the Act by failing to execute an agreement incorporating the provisions of the Metropolitan contract. We, therefore, enforce the Board's order and remedies set forth therein.

■ There are two additional points that require comment. The first is a general claim by Capitol that it is being forced to adopt contractual terms that it never agreed to. We dismiss this argument for the simple reason that we have found that Capitol did in fact agree to match the economic provisions of the Metropolitan contract. Any dissatisfaction with those provisions was an inherent risk assumed by Capitol in its offer and then agreement to match. This court is keenly concerned with not unduly intruding upon the collective bargaining process and the right of parties to make their own agreements. Enforcing the Board's order under these circumstances protects, rather than interferes with, the sanctity and integrity of the bargaining process and in fact effectuates the federal policy of maintaining and promoting "industrial peace." *See Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). There may be no greater danger to stabile and productive union-management relations than reneging on a contract. For this reason, enforcement of the Board's order here is of the utmost importance. The second point is Capitol's claim that even assuming there was in fact an agreement to match, that agreement was limited to one year and the second year provisions of the Metropolitan contract need not therefore be matched. There is nothing in the record to indicate that during the July 17 negotiations, any type of contract duration condition was attached to Capitol's offer. The evidence credited by the ALJ shows that President Alevizos promised that "if Metropolitan or Edison give anything, [Capitol] will give the same." No mention was made at that or any other time that the match was to extend to only one year. Capitol's dissatisfaction with the length of the Metropolitan contract was a risk it assumed when making the offer. It cannot now be heard to claim implied conditions were at-

tached to the offer when the plain language indicates otherwise.

### Unilateral Change in Health Insurance and Pension Plans

The ALJ concluded that Capitol committed no violations when it hired eleven replacement employees and offered them health insurance and pension plans different from those provided for in the expired contract. He did conclude, without explanation, that Capitol violated §§ 8(a)(1) and (5) by changing those benefits for the three returning strikers.[6] The issue presented to this court is whether, in the absence of an impasse in negotiations, an employer may unilaterally change health and pension benefits for returning unfair labor practice strikers as it may for replacement employees.

 In the absence of a true impasse in negotiations, an employer may not unilaterally change the terms and conditions of employment without first granting its employees' exclusive bargaining representative the opportunity to bargain about "mandatory" subjects. *N.L.R.B. v. Katz*, 369 U.S. 736, 747–48, 82 S.Ct. 1107, 1113–14, 8 L.Ed.2d 230 (1962); *Atlas Metal Parts Co., Inc. v. N.L.R.B.*, 660 F.2d 304, 309 (7th Cir. 1981). Changes in health benefit programs and pension fund contributions constitute mandatory subjects of collective bargaining. *See Keystone Steel & Wire, etc. v. N.L.R.B.*, 606 F.2d 171, 178–79 (7th Cir. 1979) ("Keystone I"); *N.L.R.B. v. Haberman Construction Co.*, 641 F.2d at 357. It is settled that this duty does not extend to the terms and conditions of employment for replacements of striking employees. *Leveld Wholesale, Inc.*, 218 N.L.R.B. 1344 (1975); *Imperial Outdoor Advertising*, 192 N.L.R.B. 1248 (1971), enf'd, 470 F.2d 484 (8th Cir. 1972). The reason for this principle is that the interests of strike replace-

ments are different from those of strikers and the Union cannot be expected to effectively represent these conflicting interests. This reasoning was affirmed by the Board without comment in *Leveld Wholesale, Inc.*, 218 N.L.R.B. 1344, 1350 (1975):

> Even after termination of a contract a union represents all the employees in the bargaining unit. That includes both strikers and strike replacements. However, the interests of the two groups are not the same. Strike replacements can reasonably foresee that, if the union is successful, the strikers will return to work and the strike replacements will be out of a job. It is understandable that unions do not look with favor on persons who cross their picket lines and perform the work of strikers.

The relationship between returning strikers and strikers was not addressed by the Board in *Leveld*. It did not need to reach that issue inasmuch as an impasse had been reached in negotiations at the time the strikers returned and the change in benefits had previously been offered at the bargaining table. Nevertheless, the Board did suggest that the interests of returning strikers are more closely aligned to those of the strike replacements than to those of the strikers.

> Three of the strikers returned to work on or about November 1. With regard to fringe benefit plans, they were treated the same as the strike replacements [i.e., their fringe benefits were changed, *id.*, at 1351]. As is set forth above, there is a vast distinction between the interests of a striker and a strike replacement. *To a large extent, the striker who crosses the Union's picket line and returns to work adopts the interests of the strike replacement. However, that issue need not be reached,* because at the time the three strikers returned to work on or about

---

6. The plans were changed from Union sponsored funds to privately administered funds of an equivalent level. Capitol does not argue that this change did not have a material or significant effect or impact upon a term or condition of employment as was argued by the employer in *Keystone Steel & Wire, etc. v.*

*N.L.R.B.*, 606 F.2d 171, 178–79 (7th Cir. 1979), which involved a unilateral change by the employer of the administrator of a health benefit program. For this reason, we shall restrict our analysis to the only argument raised by Capitol which concerns the status of returning strikers.

November 1, an impasse had already been reached. The Company had offered to cover employees under its own fringe benefit plans and the Union had not accepted that offer.

218 N.L.R.B. at 1350–51 (emphasis added). Other than this dictum from *Leveld*, neither the Board nor any federal court of appeal has apparently addressed the issue left unresolved in *Leveld*. In view of the absence of any impasse in negotiations in this case, we now address it.

■ Section 2(3) of the Act (29 U.S.C. § 152(3)) includes in the definition of employee "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment . . . ." A striking employee, even if replaced, retains employee status and is entitled to all benefits and protections provided under the Act, including normally the right to reinstatement on application at the termination of the strike. *N.L.R.B. v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345, 58 S.Ct. 904, 910, 82 L.Ed. 1381 (1938); *N.L.R.B. v. Knuth Brothers, Inc.*, 584 F.2d 813, 816 (7th Cir. 1978).

■ In this case, it was Capitol's unfair labor practice as found earlier which was a significant factor in the strike by its 14 employees. Employees who engage in work stoppages in protest against such conduct by their employer are said to be unfair labor practice strikers. *N.L.R.B. v. Lyon & Ryan Ford*, 647 F.2d at 754. The significance in the distinction between unfair labor practice strikers and what are referred to as economic strikers lies primarily in reinstatement rights. Only recently has this court had the occasion to once again set forth this important principle. *See Atlas Metal Parts Co., Inc. v. N.L.R.B., supra; N.L.R.B. v. Lyon & Ryan Ford, Inc., supra.* In *Atlas Metal*, 660 F.2d at 310, the court explained:

The right to reinstatement of economic strikers differs from that of unfair labor practice strikers. An employer's responsibility to reinstate economic strikers is limited to the employer's legitimate staffing requirements. *Chauffeurs, Teamsters & Helpers "General" Local No. 200, AFL v. N.L.R.B.*, 233 F.2d 233, 238 (7th Cir. 1956). Upon an unconditional offer to return to work, unfair labor practice strikers are entitled to immediate reinstatement to their former jobs or, if those no longer exist, to substantially equivalent positions. *N.L.R.B. v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 754 (7th Cir. 1981).

■ In distinguishing the interest of strike replacements and strikers in *Leveld*, the Board emphasized the fragile job security possessed by the strike replacements. They knew that at the conclusion of the strike there was a strong likelihood that their employment would be discontinued and the strikers would return to their old positions. In an unfair labor practice setting, the fear of displacement is increased for a replacement. This lack of security places replacements in a position quite opposite to those of the strikers. Returning strikers, however, do not share the same concern regarding retention of employment. They have no fear of being displaced at the conclusion of the strike as may the replacements. Thus, the significant distinction considered by the Board in *Leveld* is not present. We believe that in this case the interests of the three returning strikers are more closely aligned to those of the strikers. Returning strikers are and remain members of the bargaining unit even though they find themselves on the opposite side of the picket line from the strikers. Their interests of course differ to some degree by this fact alone, but the difference is not sufficient to permit unilateral action by the employer. We are not prepared to assume as Capitol would have us do that the reason for returning to work was because of a conflict with the interests of the strikers. Capitol had a duty to bargain with the Union before changing any of the benefits being received by the three returning strikers. By failing to do so, Capitol bypassed the still legitimate and exclusive bargaining

agent of the three employees. To permit such conduct would result in a serious undermining of the Union's authority and leave the impression with all employees that the Union is powerless. *See Carpenter Sprinkler Corp. v. N.L.R.B.*, 605 F.2d 60, 64–5 (2d Cir. 1979). This result was clearly expressed by this court in *N.L.R.B. v. Keystone Steel & Wire, Etc.*, 653 F.2d 304, 307 (7th Cir. 1981) ("Keystone II") (footnotes omitted):

> Where, as here, the employees' expectation for "no change without consent" is defeated by the unilateral action of the employer, the stability of the bargaining relationship is impaired. The likely effect of such instability is to create perceptions of unfairness and of union weakness; the reaction to these perceptions may be increased militancy and labor unrest. Thus, we conclude that the Board's remedy here, correcting a unilateral change in a term or condition of employment, is consistent with an important policy behind the Act.

For all these reasons, we hold that an employer may not unilaterally change the terms and conditions of employment for an employee who returns to work after being on strike in protest against an employer's unfair labor practice.[7] We, therefore, order enforcement of the Board's decision and remedy.

---

7. As reinstatement rights differ between unfair labor practice and economic strikers, we limit our holding to the former and leave for another case the issue whether the interests of returning economic strikers are more closely aligned with those of the replacements than with those of the strikers.