756 F.2d 659
 118 L.R.R.M. (BNA) 2975, 53 USLW 2461,
102 Lab.Cas. P 11,398
 TEAMSTERS LOCAL UNION NO. 688, affiliated with the
International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of
America, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Crown Cork and Seal Company, Incorporated, Intervenor.
 No. 84-1300.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 15, 1984.
Decided March 6, 1985.
 
 George O. Suggs, St. Louis, Mo., for petitioner.
 Alan D. Berkowitz, Philadelphia, Pa., for intervenor.
 John Ferguson, N.L.R.B., Washington, D.C., for respondent.
 Before BRIGHT, McMILLIAN and BOWMAN, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 Teamsters Local Union No. 688 (the Union) requests review of an order of the National Labor Relations Board (NLRB) dismissing an unfair labor complaint filed against the Crown Cork and Seal Company (the Company). For reversal the Union argues that (1) the NLRB incorrectly found that the Company's settlement offer had lapsed when the Union attempted to accept the offer and (2) the decision of the NLRB is not supported by substantial evidence on the whole record. For the reasons discussed below, we grant the petition for review.
 
 
 2
 The Company manufactures and distributes containers and related products and has plants in several states. The Union represents two separate bargaining units at the Company's plant in St. Louis, Missouri--the office clerical employees and the production and maintenance employees. The most recent collective bargaining agreement for the production and maintenance unit was effective from March 5, 1979, to March 7, 1982.
 
 
 3
 On July 28, 1980, the Company formally notified the Union that it intended to close its St. Louis plant by the end of September 1980. Thereafter, the Union requested negotiations on the effects of this closing and in August 1980 these negotiations began. Two months later, in October 1980 production at the St. Louis plant ceased.
 
 
 4
 The Company's chief negotiator on the plant closing was Industrial Relations Director Harold Abrams; the Union's principal negotiator was Business Representative Kenneth DeGrande. Between the first bargaining session in August 1980 and the final face-to-face session on May 8, 1981, these representatives and others met several times in an effort to reach satisfactory settlement agreements.
 
 
 5
 When the parties met on May 8, 1981, they did not reach agreement on a settlement for the clerical employees or on severance pay, pro rata vacation pay, or pension contributions for the production and maintenance workers. After a discussion of these three issues, Abrams made an offer of $40,000 as a complete settlement of all issues in the production and maintenance unit. The employees rejected the offer as insufficient. Discussion became hostile and DeGrande suggested that it would be best to end the meeting. The parties agreed to separate bargaining for the two units in the future.
 
 
 6
 Between May 8 and July 13, 1981, DeGrande had two or three telephone conversations with Abrams about the plant closing. On July 22, 1981, the Union and the Company reached a final settlement on the severance pay for clerical employees. There was no agreement on the settlement for the production and maintenance employees; from July through the remainder of 1981, the Union did not contact the Company to discuss this matter.
 
 
 7
 On July 31, 1981, the Company informed DeGrande and the representatives of other unions that it was transferring all the St. Louis plant's financial and personnel records to another location. In November 1981 the Company terminated the last of the production and maintenance employees who had been retained to remove plant equipment and to prepare some of it for sale. The Company then closed the plant.
 
 
 8
 On January 4, 1982, DeGrande telephoned Abrams to advise him that the production and maintenance employees would accept the $40,000 settlement offer that had been made on May 8, 1981. DeGrande initiated the conversation by saying, "I assume the offer of forty thousand is still on the table." Abrams replied, "[Y]ou've got to be kidding." After chuckling a little, DeGrande said that he was not. Abrams promised to call DeGrande back.
 
 
 9
 Abrams reported DeGrande's telephone call to Company president Avery, who directed Abrams to get the Union's position in writing. On January 13, 1982, Abrams telephoned DeGrande and told him that the "issue had been up in the air so long" that he would have to have the acceptance in writing "because this issue is out of my hands at this point." DeGrande said that he would "go back and recommend to the committee the acceptance of the $40,000 lump sum settlement and that [he] would make every effort possible to get it agreed to as rapidly as possible." DeGrande then telephoned the Union's chief steward and asked him to contact the other members of the bargaining committee and inform them that DeGrande recommended acceptance of the $40,000 lump sum settlement offer. Two months later, on March 19, 1982, the Union sent the Company a letter accepting the Company's offer.
 
 
 10
 On April 20, 1982, Abrams informed DeGrande by letter that the Union's acceptance was "too late" because the Union had rejected the Company's settlement offer "about a year ago" and the "books for that plant have been closed."
 
 
 11
 On June 21, 1982, the Union filed an unfair labor practice charge alleging that the Company failed to bargain in good faith. The NLRB regional director issued a complaint and a hearing was held before an administrative law judge (ALJ) on March 11, 1983. The ALJ found that the Company did not believe that its offer had been withdrawn and therefore the offer was still viable at the time of the Union's acceptance.
 
 
 12
 The NLRB, however, found that the Union had not accepted the Company's settlement offer within a reasonable time and that the offer had lapsed. The Board concluded that the Company did not violate the Labor-Management Relations Act, 29 U.S.C. Sec. 158(a)(5) (1982), by refusing to execute an agreement embodying the terms of its May 1981 offer. Accordingly, the Board dismissed the complaint.
 
 
 13
 On March 6, 1984, the Union filed its petition for review. Subsequently, the Company was granted leave to intervene.
 
 
 14
 The issue in this case is whether the Company's offer lapsed between the time the offer was made and the time the Union accepted the offer. The Union argues that the offer did not lapse because the Company did not believe it had lapsed. Further, the Union argues that the NLRB incorrectly considered only the length of time between the offer and the acceptance and did not consider, as the ALJ did, whether the Company believed the offer to have lapsed at the time the Union accepted.
 
 
 15
 In collective bargaining, an offer remains open to facilitate negotiation and agreement. In Pepsi Cola Bottling Co. v. NLRB, 659 F.2d 87 (8th Cir.1981) (Pepsi Cola ), the union initially rejected the offer and three weeks passed between offer and acceptance. During the three-week interval, the employer met with the union for several bargaining sessions but did not expressly withdraw its offer. The company informed the union that the offer had been withdrawn when the union attempted to accept the offer. We held that "an offer, once made, will remain on the table unless explicitly withdrawn by the offeror or unless circumstances arise which could lead the parties to reasonably believe that the offer had been withdrawn." Id. at 90. We affirmed the Board's order requiring the employer to execute the contract proposal.
 
 
 16
 Other circuits have followed Pepsi Cola. The Seventh Circuit held that an employer was bound by an unconditional offer to match the contract between the union and a competitor because the employer never explicitly withdrew its offer and the subsequent negotiation and inconsistent offers by the employer did not lead the union to reasonably believe that the offer had been withdrawn. Capitol Husting Co. v. NLRB, 671 F.2d 237, 244-45 (7th Cir.1982). The Ninth Circuit likewise held that an employer's final contract offer was open although the offer had been rejected, two counteroffers had been made, and a strike had occurred after the offer. The union accepted the offer about eighteen days after the offer was made. Presto Casting Co. v. NLRB, 708 F.2d 495, 496-97 (9th Cir.1983).
 
 
 17
 The Sixth Circuit, however, has held that an offer expired after three months without an acceptance. The employer advised the union, at the time the union attempted to accept, that the offer had expired. Importantly, the NLRB found that the employer reasonably believed that the offer had lapsed prior to the acceptance. Lucas County Farm Bureau Cooperative Ass'n, 218 N.L.R.B. 1150 (1975), supplemented, 218 N.L.R.B. 1155 (1976), enforced, 557 F.2d 1227 (6th Cir.1977).
 
 
 18
 The facts of this case present a somewhat different problem. The time period between offer and acceptance here is five or more months,[1] and no negotiations or communications occurred during the interim period. The NLRB, considering these facts and relying on Pepsi Cola, held that five months was an unreasonable period of time between offer and acceptance and therefore the offer expired.
 
 
 19
 We hold that the NLRB misapplied the law in determining that the Company's offer lapsed before acceptance. The NLRB incorrectly considered only the length of time between the offer and the acceptance and concluded that the offer had lapsed because it had not been accepted within a reasonable time.
 
 
 20
 Where it is conceded that the offer has not been explicitly withdrawn, the correct test for determining whether the offer has lapsed is the reasonable belief of the parties. If one of the parties believes that the offer has lapsed, then it is necessary to consider whether the belief is reasonable, that is, whether circumstances would lead a party to reasonably believe that the offer has expired. Pepsi Cola, 659 F.2d at 90. Length of time between offer and acceptance is only one of the circumstances to be considered.
 
 
 21
 In examining the reasonableness of the Company's belief that the offer had lapsed, we are confronted initially with evidence which is totally inconsistent with such a belief. On January 13, 1982, Abrams, having consulted with the president of the Company, telephoned DeGrande and told him to submit the Union's acceptance in writing. Abrams did not advise the Union that the offer had lapsed during this conversation or during the January 4, 1982, telephone conversation initiated by the Union. The ALJ found that the request indicated that the Company believed the original offer to be open; if the Company believed that the offer had lapsed, it could not have in good faith requested a written acceptance.
 
 
 22
 Even if we were to accept the NLRB's finding that the original offer expired because it was not accepted within a reasonable time, there was still an outstanding offer which the Union could accept. The Company's request for a written acceptance is clearly a recognition of an existing and open offer or a renewal of a previous offer which had expired. This revived offer could be accepted even if the previous offer had lapsed. The Company did not explicitly withdraw this revived offer from January 13, 1982, to the receipt of the written acceptance; nor did circumstances exist during this period which would lead the Company to believe the revived offer had lapsed.
 
 
 23
 One other fact lends support to our conclusion that the NLRB's finding that the Company reasonably believed that the offer had lapsed is not supported by substantial evidence in the record as a whole. The Company did not inform the Union that it considered the acceptance to be "too late" until three months after the Union indicated orally that it would accept the offer and more than one month after the Company received the Union's written acceptance. The Company could have told the Union the offer had lapsed during the conversations in January 1982. We believe that the Company would have done so if it had in fact considered the offer to have lapsed.
 
 
 24
 Additionally, it seems quite clear that the Company recognized an obligation to pay some amount to terminated employees. It made its $40,000 offer to the maintenance and production employees on May 8, 1981. Subsequently, it settled with and made a substantial payment to the Company's former clerical employees on July 22, 1981. Nowhere in the record does the Company claim that it did not have an underlying obligation to negotiate with the Union and pay some amount in the severance of its union employees. This factor also supports our view that the offer was a continuing one under the circumstances of this case.
 
 
 25
 We hold that the NLRB misapplied the holding in Pepsi Cola and that its finding that the offer had lapsed is not supported by substantial evidence in the record as a whole. Pepsi Cola is not to be given the crabbed and narrow reading it received from the NLRB. Accordingly, we grant the petition for review and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 The parties disagree as to the length of time between offer and acceptance. The Union includes the months between the last negotiation session in July 1981 and the Union's oral acceptance in January 1982--five months. The Company includes the time from the original offer in May 1981 to the Union's written acceptance in March 1982--ten months