James FRASCONE, Stephen Schall, Dennis Sutter and Patrick Tebo, Plaintiffs,

v.

GENERAL PENSION BOARD OF the CONTINENTAL PENSION PLAN, Continental Can Co., a Delaware corporation, and U.S. Can Co., a Delaware corporation, Defendants.

No. 88 C 2051.

United States District Court,
N.D. Illinois, E.D.

Dec. 7, 1990.

Jeffrey Lawrence, Kelley, Kelley and Kelley, Schaumburg, Ill., and Mark J. Muscarello, Thomas P. Young, Muscarello, Crisanti & Young, Elgin, Ill., for plaintiffs.

Rody B. Biggert, Seyfarth Shaw Fairweather & Geraldson, Chicago, Ill., for U.S. Can Co.

John R. Myers, Gregory T. Schroedter, Bell, Boyd & Lloyd, Chicago, Ill., for all other defendants.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

Plaintiffs in this action seek pension benefits which were allegedly promised to them by their employer before they were laid off. Pending are cross-motions for partial summary judgment. For the reasons described below, plaintiffs' motion is granted and defendants' motion is denied.

### II. FACTS

The majority of the facts in this case are undisputed. Plaintiffs are four former employees of defendant Continental Can Company ("CONCAN") who, beginning between 1960 and 1963, worked at a packaging plant in Itasca, Illinois, known as "Plant 465." Beginning in 1974, employees at Plant 465 elected six representatives on an annual basis to serve as members of a "Participative Management Committee." Those representatives negotiated with CONCAN regarding the terms and conditions of employment.

On March 30, 1984, CONCAN management at Plant 465 issued a memorandum entitled "Understanding Between Permanent Employees at Plant 465 Itasca and the Management of General Packaging Operations" (the "1984 Memorandum"). The 1984 Memorandum expressed the management's commitment to provide certain wages and benefits in accordance with a collective bargaining agreement between CONCAN and the International Association of Machinists ("IAM") which was due to expire March 31, 1986. (The employees are not IAM members.) The 1984 Memorandum also stated:

> This understanding will be for the duration of the agreement reached between the IAM and CCC on a national agreement basis, plus 30 days.

> During the 30–day period following the expiration date of the IAM national agreement, company representatives and Itasca committee representatives will discuss the implementation of any changes negotiated so that parity may be achieved.

The 1984 Memorandum was posted on bulletin boards, where it could be read by all employees.

With respect to benefits, the 1984 Memorandum stated that CONCAN would "[p]rovide early pensions (75/80, R–65 w/25 years) consistent with the IAM Master Agreement." It is the "Rule of 65," or special early pension, benefit that is at issue in this case. The IAM Master Agreement incorporated a Pension Agreement which contained a provision for a special early pension for an employee whose continuous service is broken as the result of a layoff for two continuous years if that employee has completed 25 years of service and has combined years of age and regular continuous service equalling 65 or more.

At a meeting of the Participative Management Committee on April 23, 1986, the employee representatives informed management that they wished to be governed by the new IAM Master Agreement covering the period from April 1, 1986, to March 31, 1989, but that they wanted wages $1.25 per hour higher than those provided in the Master Agreement. Also at that meeting, management gave the employee representatives copies of the Continental Pension Plan and Supplemental Un-

employment Benefits Plan. The Pension Plan booklet included a provision for a "Rule of 65" pension benefit.

At a subsequent meeting of the Participative Management Committee on May 8, 1986, management informed the employee representatives that CONCAN was willing to follow the new IAM Master Agreement but was not willing to pay the additional $1.25 per hour. The minutes of this meeting were posted on the plant bulletin board.

On May 9, 1986, management representative Charles E. Crisp wrote a memorandum (the "1986 Memorandum") to O. Stickney, his superior at CONCAN's general offices in Connecticut, describing the previous day's meeting. Attached to the 1986 Memorandum was a four-page position paper setting forth the management's position in the negotiations. At the bottom of the second page appeared the words: "Our commitment—IAM parity." The 1986 Memorandum and the position paper were posted on the plant bulletin board. By "IAM parity," the company meant that it was offering its employees the same wages and benefits as could reasonably be applied to the Itasca facility as those contained in the IAM Master Agreement.

At a meeting of the Participative Management Committee on January 14, 1987, employee representative Patrick Tebo (a plaintiff in this case) reminded management that a pension plan booklet describing benefits under the new IAM Master Agreement needed to be prepared for distribution to all Plant 465 employees. Management representatives stated that a summary plan description specifically for Plant 465 employees would be prepared by CONCAN's actuaries and that, retroactive to March 1, 1968, the employees' pension rights would be governed by the new summary plan description. The minutes of this meeting were posted on the plant bulletin board.

On January 20, 1987, Crisp wrote a memorandum to Ruth Mitchell at CONCAN's general offices in Connecticut stating that Plant 465 employees were entitled to the "Rule of 65" pension consistent with the IAM Master Agreement and that the new summary plan description should so reflect. That letter was subsequently posted on the plant bulletin board. On January 27, 1987,

JoAnn Hanson, who worked with Ruth Mitchell, wrote a letter to Carol S. Dunckley, a senior benefit consultant for Buck Consultants, Inc., which served as CONCAN's actuary. Hanson enclosed a copy of the January 20 memorandum and requested Dunckley to incorporate the "Rule of 65" pension provisions into the draft Summary Plan Description she was preparing for non-organized workers at Itasca.

No employee representative ever communicated to management that the employees were dropping their demand for the additional $1.25 per hour or was agreeing to IAM parity. CONCAN implemented IAM parity in January and February of 1987.

On March 23, 1987, Dunckley sent Hanson copies of a "draft pension Summary Plan Description effective March 1, 1986 for employees at Plant # 465 Itasca." The letter states, "We have added the same rule of 65 pension provision as exists in the IAM Master Agreement pension booklet." The Summary Plan Description was never finalized or distributed to employees.

On April 24, 1987, CONCAN posted a notice on the bulletin board which stated that because of an imminent sale of CONCAN's General Packaging Operations to defendant U.S. Can Company ("USCAN"), pension benefits might be paid in part by USCAN. The notice further stated that "the payment of the pension benefit from two different plans does not result in a reduction in current pension benefit levels."

On May 13, 1987, CONCAN and USCAN executed an Acquisition Agreement. Article VI of that agreement provides a comprehensive plan for allocation of employee benefit costs. Section 6.04(d), which addresses respective pension liabilities to hourly employees terminated as the result of a plant closing, provides that USCAN shall reimburse CONCAN for the basic benefit payment until the employee reaches age 63, as well as any lump sum retirement benefit.

On June 1, 1987, CONCAN posted another notice on the bulletin board which stated: "During this transition period, U.S. Can has requested that your coverage under *all* of Continental's Benefit Plans re-

main in force, just as if there had been no sale. Continental will administer your benefits on U.S. Can's behalf."

In August, 1987, USCAN announced that it was closing Plant 465 and transferring its operations to a USCAN plant in Elgin, Illinois. On October 23, 1987, plaintiff Stephen Schall was laid off. In November, 1987, in contemplation of the plant closing, plaintiffs requested USCAN to forward their applications for "Rule of 65" pensions to defendant General Pension Board of the Continental Pension Plan ("Pension Board"). The applications were forwarded to Connecticut on November 10, 1987. On December 12, 1987, Plant 465 was closed and the remaining plaintiffs were laid off. The Pension Board has not acted on plaintiffs' pension applications.

When plaintiffs were laid off, they each had completed (or would complete within two years of a plant closing) at least 25 years of regular continuous service. The combined years of age and regular continuous service for each plaintiff was at least 65. Furthermore, their regular continuous service was broken by retirement following a permanent plant shutdown. Accordingly, each plaintiff met the requirements for a "Rule of 65" pension.

The complaint seeks relief in six counts. Count I, which seeks a declaratory judgment that plaintiffs are entitled to Rule of 65 pensions pursuant to a collective bargaining agreement, is brought pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). Count II alleges breach of contract pursuant to Illinois state law. Count III seeks an injunction requiring the Pension Board to act on plaintiffs' pension applications. Count IV asserts a claim for supplemental unemployment benefits on behalf of plaintiff Stephen Schall. Count V asserts claims for group health benefits on behalf of plaintiffs Schall and Tebo. Count VI, which was added during the briefing of the summary judgment motions, asserts a claim pursuant to ERISA for the Rule of 65 pension benefits. Plaintiffs have moved for summary judgment on Counts I, II and VI, and defendants have cross-moved for summary judgment on Counts I and II.

## III.  COUNT ONE

### A.  Formation of Contract

With respect to Count I, the parties initially dispute whether there is a collective bargaining agreement which recognizes the "Rule of 65" pension benefits. Defendants maintain that no collective bargaining agreement existed because the parties never agreed on the wage rate, an important substantive term of the agreement. They contend that the employees made an offer on April 23, 1986, for an agreement incorporating a $1.25 per hour wage increase over the IAM Master Agreement. Defendants then made a counteroffer of IAM parity, which the employees never acted upon. No acceptance was ever made, and no contract was formed.

Plaintiffs maintain that the employees did indeed accept the counteroffer, and that such acceptance is evidenced by the circumstances even though no formal pronouncement of acceptance was made.

In the context of collective bargaining, courts apply the general common law of contracts but do so in a flexible manner in order to effectuate the policies underlying federal labor law. *Capitol-Husting Co. v. N.L.R.B.*, 671 F.2d 237, 242 (7th Cir.1982). "[A]lthough the technical rules comprising contract law do not necessarily control all decisions in labor-management cases, the normal rules of offer and acceptance are generally determinative of the existence of a collective bargaining agreement." *Id.* In determining whether a contract offer has been accepted, the "crucial inquiry is whether the two sides have reached an 'agreement,' even though that 'agreement' might fall short of the technical requirements of an accepted contract." *Id.*, quoting *N.L.R.B. v. Donkin's Inn, Inc.*, 532 F.2d 138, 141 (9th Cir.), *cert. denied*, 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976). Accordingly, acceptance need not be evidenced by a signed contract or a formal pronouncement. It may be inferred from the conduct following the making of the offer. *Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir.1988); *Capitol*, 671 F.2d at 243. "All that is required is conduct manifesting an inten-

tion to abide and be bound by the terms of an agreement." *Capitol*, 671 F.2d at 243.

The *Capitol* and *Robbins* cases are instructive in illustrating the types of circumstances which evidence the existence of an agreement in the absence of a formal acceptance of an offer.[1] In *Capitol*, at the first meeting between the union and management concerning negotiation of a new contract, management rejected the union's demands and offered to extend the existing contract for an additional year. Management further stated that it would give the same concessions that the union could obtain from either of the company's two competitors. The union did not expressly accept management's offer, but it ended the meeting and directed its efforts solely toward reaching an agreement with the two competitors.

The union did achieve an agreement for increased wages and benefits from one of the company's competitors after it struck that competitor. The union then called upon management to match the competitor's contract, and management refused. The court upheld the NLRB's finding that there was an agreement to match the competitor's contract. Although the union did not expressly accept the offer to match, acceptance was inferred from the union's conduct in terminating negotiations and focusing on negotiations with the competitors. The court found that "a reasonable person in the position of [the company's president] would have understood that the Union had expressed its assent to [the] offer to match." 671 F.2d at 243. The court noted that if there had been no acceptance, the existing agreement would have expired and further negotiations would have been scheduled. However, the union relied upon the offer to match by turning its attention to the competitors, and the company benefitted as the existing contract remained in effect. *Id.*

In *Robbins,* upon the expiration in 1976 of a master collective bargaining agreement which had been signed by the employer, the employer executed a promise to be bound by any master agreement thereafter concluded. Such a master agreement was reached, and the company adhered to its terms. Upon its expiration in 1979, the company sent the union the following written statement:

> Want To Inform You We Are Willing To Pay What Ever The International And The Truckers Agree On For The New Contract Which Is Due 4–1–79. We Would Like To Contunie [sic] To Operate. If It Is O.K. With The Union And We Will Sign The New Contract. Please Send Us A Letter To That Effect.

836 F.2d at 331. The union did not reply. However, until the end of 1981, the company paid the wages, made the benefit contributions, and followed the grievance procedures of the master agreement. When a dispute arose as to whether the company was bound by the agreement, the court affirmed summary judgment in favor of the union. The court found that whatever the company's subjective intent may have been, the objective evidence indicated that the company had accepted the collective bargaining agreement. 836 F.2d at 332.

■ This case is controlled by *Capitol* and *Robbins*. As in those cases, the company made an offer which the employees never expressly accepted. Also like those cases, the conduct of both parties following the offer indicated that they believed themselves bound to its terms. If the employees in this case had not accepted the offer of IAM parity, it is likely that further negotiations would have ensued concerning the terms of a collective bargaining agreement. Furthermore, the employees continued to work, despite the failure to achieve a wage increase, and the company continued to pay them in accordance with the master agreement. The company also prepared to distribute a new Summary Plan Description which included the Rule of 65 pension, and in light of the surrounding circumstances the Court cannot accept defendants' explanation that the plan descrip-

---

**1.** Inexplicably, neither party brought either of these highly relevant cases to the Court's atten-
tion.

tion was prepared only in anticipation of an eventual agreement rather than pursuant to a belief by the company that it was bound by an existing agreement. But for the instant dispute, no reasonable observer would believe that the employees were not covered by the terms of the master agreement. Certainly the employees themselves had every reason to believe that they were covered by a collective bargaining agreement, including the benefits provisions. If they had had any indication that the company did not believe there was an agreement, the employees would certainly have pressed for one. Their failure to do so constitutes a clear reliance on the company's behavior in acting as if there were an agreement.

Defendants argue that an agreement was never reached because a substantive term—wages—was left open. "As a general rule, a contract does not arise if the union and management have not resolved a dispute over a substantive term." *Bobbie Brooks, Inc. v. International Ladies' Garment Workers Union*, 835 F.2d 1164, 1168 (6th Cir.1987). For the reasons already stated, the Court finds that the parties did agree on wages—the employees implicitly accepted the offer of IAM parity on wages. However, even accepting defendants' view that the wages were never agreed upon, the Court finds that the parties entered into a contract. The issue would hinge upon whether the parties agreed to defer negotiation on the disputed issue, or whether they instead made an agreement explicitly subject to resolution of the disputed issue. *Id.* There is no indication here that the parties' disagreement over wages blocked the achievement of an overall agreement. If indeed the wage issue was never resolved, it was left open as a side issue as the parties agreed to IAM parity in all other respects.

### B. Exhaustion of Remedies

Defendants next contend that even if there was an agreement, plaintiffs' claim must be dismissed because they failed to pursue the remedies mandated by that agreement. *See Clayton v. International Union, United Automobile, Aerospace and Agricultural Workers*, 451 U.S. 679, 682, 101 S.Ct. 2088, 2091, 68 L.Ed.2d 538 (1981) (employee seeking remedy for alleged breach of collective bargaining agreement must attempt to exhaust any exclusive grievance and arbitration procedures established by that agreement). The exhaustion rule rests on two considerations: protection of the integrity of the collective bargaining process and furtherance of the national labor policy that encourages private resolution of disputes over collective bargaining agreements. *Id.* at 687, 101 S.Ct. at 2094. The rule is not inflexible, however, and does not require exhaustion where those interests would not be furthered. *See, e.g., id.* at 689, 101 S.Ct. at 2095; *Richards v. Local 134, IBEW*, 790 F.2d 633, 637 (7th Cir.1986). *See also Gorski v. Local Union 134, IBEW*, 636 F.Supp. 1174, 1184 (N.D.Ill.1986) (employee not required to exhaust grievance procedures where union had no grievance procedure capable of giving her relief she sought).

Defendants argue in their initial brief that plaintiffs have failed to exhaust the grievance and arbitration procedures referred to in the IAM Master Agreement and the Pension Agreement it incorporated. Defendants quote the following provision from the plan description:

Any differences that may arise between you and the Company concerning your application for, your entitlement to or the amount of payment of a lump sum retirement allowance, pension or deferred benefit may be taken up as grievance in accordance with the applicable provisions of the Master Agreement beginning at step 3 of the Grievance Procedure....

▪ Plaintiffs respond that this grievance procedure does not apply. "IAM parity" refers to provision of the same wages and benefits contained in the IAM Master Agreement "as could reasonably be applied to the Itasca facility."[2] Because the Itasca employees here were not union members, plaintiffs argue that the union grievance procedures described in the IAM Mas-

2. This definition comes from defendants' answers to plaintiffs' interrogatories.

ter Agreement could not "reasonably be applied to the Itasca facility." Rather, they argue, the applicable process is that described in the Summary Plan Description drafted on March 23, 1987, to be effective retroactively to March 1, 1986. That plan provided:

APPEALS PROCEDURE

Any differences or any denial of a claim that may arise between you or a beneficiary and the Company concerning eligibility for or the amount of payment of a lump sum retirement allowance, pension or deferred benefit may be discussed with your Human Resources representative. You or any beneficiary are entitled to a full and fair review of any denial of a claim. If you feel that you wish further review following those discussions, you should address your request for a review in writing to the General Pension Board within 60 days from the time you are notified that the claim has been denied. In denying any claim, the General Pension Board will send a written notice explaining the specific reasons for the denial, and will make reference to those provisions of the booklet or the Plan upon which the decision was based. Normally, a decision will be made within 60 days of receipt of the request for a review.

The same provision was included in the previous Summary Plan Description distributed to employees in 1981. In this case, plaintiffs submitted pension applications to the Pension Board, but the Board never acted on their applications. Accordingly, plaintiffs argue that they have availed themselves of contractual remedies insofar as they are able to do so.

The Court finds plaintiffs' arguments convincing with respect to the exhaustion issue. Furthermore, defendants elected not to press this issue in their reply brief and thus implicitly conceded the validity of plaintiffs' arguments. Accordingly, the Court finds that plaintiffs' claim is not barred by a failure to pursue contractual remedies.

## IV. COUNT SIX

In Count VI, plaintiffs assert an ERISA claim based on the Summary Plan Descrip-

tion which defendants prepared for Plant 465 but never distributed to the employees. Plaintiffs note that an ERISA claim may be based on a benefits plan which has never been reduced to writing or distributed to employees, where the surrounding circumstances would enable a reasonable person to ascertain intended benefits, beneficiaries, sources of financing and procedures. *See Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503–04 (9th Cir.1985); *Donovan v. Dillingham*, 688 F.2d 1367, 1372–73 (11th Cir.1982).

Defendants respond that the issue here is not whether an ERISA-covered plan was established in 1986 or 1987, but rather whether the pre-existing plan, which did not include a Rule of 65 provision, was ever amended. Defendants argue that this is a question of fact which precludes summary judgment, but they emphasize that ERISA generally precludes oral or informal modifications to benefit plans. *See Bash v. Firstmark Standard Life Insurance Co.*, 861 F.2d 159, 163 (7th Cir.1988) (ERISA contains an implied prohibition of oral modifications of pension plans).

■ Plaintiffs reply that the plan was indeed modified and that the modification was in writing to the extent that it needed to be in writing. The Court agrees. Plan descriptions were distributed to employees in 1981 and 1985. Neither of those plan descriptions provided for a Rule of 65 pension benefit. However, the 1984 Memorandum expresses CONCAN's obligation to provide Rule of 65 pensions consistent with the IAM Master Agreement. In 1986, as the Court has held with respect to Count I, a new agreement was reached for IAM parity, which would include the Rule of 65 benefit. Consistent with this agreement, CONCAN then drafted a new Summary Plan Description in 1987 which included the Rule of 65 benefit but which was never actually distributed.

Under these circumstances, the Court finds that the 1987 Summary Plan Description was sufficient to meet any requirement that plan modification be in writing. The writing requirement is not inflexible. As noted above, an ERISA plan may be

found to be established in the absence of a written plan in certain circumstances. Furthermore, courts are increasingly recognizing that plans may be modified by oral representations in some instances. *See, e.g., Black v. TIC Investment Corp.,* 900 F.2d 112 (7th Cir.1990); *Lockrey v. Leavitt Tube Employees' Profit Sharing Plan,* 748 F.Supp. 662 (N.D.Ill.1990). In this case, the modification is not oral; it is written. The fact that the Summary Plan Description was never distributed to the employees is not fatal in light of CON-CAN's clear agreement to the Rule of 65 pension. Accordingly, the Court finds that there is an ERISA-covered plan which includes the Rule of 65 pension.[3]

## V. CONCLUSION

Plaintiffs' motion for partial summary judgment is granted with respect to Counts I and VI, both of which seek a declaratory judgment that plaintiffs are entitled to Rule of 65 pension benefits.[4] Defendants' cross-motion for summary judgment with respect to Count I is denied.

---

**3.** As noted above, defendants argue that whether the plan was modified is a question of fact which precludes summary judgment. The relevant facts here, however, are not disputed, and in light of those facts only one conclusion is warranted as a matter of law. Accordingly, summary judgment is appropriate.

**4.** The parties have also cross-moved for summary judgment on Count II, which asserts a claim pursuant to Illinois contract law. Defendants argue that Count II is preempted by federal law. Because the Court has determined that plaintiffs are entitled to the same relief under Counts I and VI, the Court does not reach Count II.