506 F.Supp. 92 (1980)
ACME MARKETS, INC.
v.
INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LOCAL LODGE NO. 724.
Civ. A. No. 80-0535.
United States District Court, E. D. Pennsylvania.
July 7, 1980.
*93 Thomas J. McGoldrick, Alfred J. D'Angelo, Bala Cynwyd, Pa., for plaintiff.
Bruce Endy, Ira Silverstein, Philadelphia, Pa., for defendant.

MEMORANDUM AND ORDER
GILES, District Judge.
On February 7, 1980, plaintiff, Acme Markets, Inc. (hereinafter "Acme") filed a complaint and motion for a temporary restraining order to enjoin a planned work stoppage by defendant Union, International Association of Machinists and Aerospace Workers Local Lodge No. 724 (hereinafter "Union"). The Union represents the subject bargaining unit of Acme employees.
Acme alleged that the planned work stoppage was in violation of the "no strike" and binding arbitration provisions of a valid subsisting collective bargaining agreement which had been ratified by the Union membership. By its terms, the alleged agreement was retroactive to May 27, 1979, the expiration date of the prior labor agreement. The strike action was scheduled to commence at midnight February 7, 1980.
Jurisdiction was alleged under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Acme alleged that the labor dispute in question was arbitrable under the terms of the alleged labor agreement. The court was requested to enforce the "no strike" and binding arbitration contract provisions under the doctrine of Boys Markets, Inc. v. Retail Clerks, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).
The Union countered that, although the issue in dispute would have been arbitrable under the provisions of the prior expired labor agreement, there was no present agreement in effect.
*94 Acme claimed an unfettered management right, not modified by the terms of any labor agreement or past practice, to subcontract bakery truck repairs. The Union claimed that the issue was orally raised during the 1979 negotiations, that it relied upon Acme's silence to a proposal for a restriction on subcontracting as constituting consent and that the Union membership ratified the negotiated settlement on the basis of this restriction. The Union submits that, if there was no such understanding on this particular point, there was a failure of a meeting of the minds on an essential term, and, hence, no agreement.
Thus, the issue presented for this court's determination is whether a labor agreement came into existence upon Union ratification on October 14, 1979. Controlled Sanitation Corp. v. District 128 International Association of Machinists, 524 F.2d 1324 (3d Cir. 1976). For the reasons set out below, the court concludes there was an enforceable labor agreement and that the subject of the labor dispute between the parties arises thereunder and is arbitrable under the binding arbitration provisions. Accordingly, the injunction against the work stoppage shall be made permanent and arbitration shall be directed.

I. BACKGROUND
On February 7, 1979, after hearing the factual representations and legal arguments of counsel, the court entered an order granting temporary injunctive relief against the planned work stoppage. In doing so, the court took into consideration a number of undisputed facts: (1) the parties' long collective bargaining history; (2) the parties' intention in the most recent negotiations to adopt all the provisions of the expired labor agreement, except as expressly modified; (3) modifications reduced to writing; (4) Union ratification and (5) following ratification, the parties continuation of work under the terms and conditions of the purportedly binding agreement, including payment and acceptance of benefit and wage improvements retroactive to May 27, 1979. The court concluded that the possibility of continuing irreparable harm to Acme by reason of a work stoppage which would affect its entire warehousing and retail operations in Philadelphia and the Delaware Valley outweighed any harm to the Union or its members which might result from the grant of temporary injunctive relief. The court also concluded there was a reasonable basis for believing that Acme could prevail on the merits.
A hearing to determine if the temporary restraining order was improvidently granted was scheduled for February 11, 1980. Thereafter, Acme and the Union agreed that the outstanding order would remain in full force and effect until the court determined whether or not a labor agreement existed. After an evidentiary hearing on Acme's motion for preliminary injunction, the parties submitted proposed findings of fact and conclusions of law. The court finds as follows:

II. FINDINGS OF FACT
1. Acme operates a chain of retail supermarkets, approximately 200 in number, in the Philadelphia and the Delaware Valley areas. (N.T. 48, 3/14/80). These stores sell to the general public such merchandise as meat, groceries, produce, dairy items, frozen foods and bakery products. (N.T. 49, 3/14/80).
2. The Union is an unincorporated labor organization which represents, for collective bargaining purposes, about 40 Acme employees who are truck mechanics at a bakery facility in Philadelphia. (Id.)
3. The Union is also the exclusive bargaining representative for all automotive maintenance and service employees employed by Acme in the Philadelphia area. (N.T. 51-52, 3/7/80).
4. Acme is an employer within the meaning of Section 2(2) of the National Labor Relations Act, 29 U.S.C. § 152(2).
5. The Union is a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5).
*95 6. Acme supplies its retail stores with merchandise from three warehouse facilities called Distribution Centers. The merchandise is delivered from the Distribution Centers to the stores by a fleet of trucks owned by Acme. (N.T. 49, 3/7/80).
7. The truck mechanics represented by the Union have been assigned by Acme to work at the three Distribution Centers. At one of those Centers, designated as "D.C. 1," Acme operates a large truck maintenance garage known as the "Automain," where most of Acme's truck mechanics are employed. (N.T. 13, 3/7/80).
8. Acme operates a specific fleet of Bakery trucks. For a period of time prior to the instant dispute, the bakery facility which manufactured the bakery products was located at D.C. 1 and the maintenance work performed on the bakery trucks was performed at the Automain, which is also located in D.C. 1. (N.T. 13, 3/7/80).
9. In 1977 or 1978, Acme determined corporately that the D.C. 1 Bakery was obsolete and planned to move its bakery division to a site located on Blue Grass Road in Northeast Philadelphia ("Blue Grass"). (N.T. 13, 3/7/80). There is no evidence, though, that this decision was communicated to the Union prior to commencement of negotiations.
10. Acme and the Union have maintained a collective bargaining relationship spanning many years.
11. The parties had a three year collective bargaining agreement which expired by its terms on May 26, 1979, (Exhibit C-1). It was extended by mutual consent to allow the parties time to negotiate a new agreement, with the further understanding that the new agreement would be retroactive to May 27, 1979.
12. Following their historical bargaining pattern, the parties intended to adopt in full the language of the provisions of the expired agreement, except as specifically modified, changed, amended or supplemented.
13. Among the contract provisions which the parties fully intended to adopt in any new labor agreement were the following, which provide in pertinent part:
ARTICLE I-RECOGNITION
1.1 Except as expressly provided otherwise herein, the Company recognizes the Union as the sole bargaining agency for its automotive maintenance and service employees located in the Company's garages in Philadelphia, Pennsylvania, working in classifications set forth in Exhibit A, and coming within the jurisdiction of the International Association of Machinists and Aerospace Workers, AFL-CIO.
ARTICLE VII-GRIEVANCE PROCEDURE
7.1 The Company will meet any authorized official of the Union at any reasonable time to adjust grievances arising under the terms of this Agreement.
7.2(d) The matter may then be submitted to arbitration as provided for below.
7.3 ARBITRATION PROCEDURE:
(c) ... "The arbitrator's decision shall be submitted, in writing, within thirty (30) days of the hearing and shall be final and binding upon the parties."
ARTICLE X-MANAGEMENT SECURITY
The Union and the Company agree that the provisions of this Agreement shall be expressly limited to hours, wages, and working conditions of the employees, and no provision hereof shall be construed to restrain the Company from the full and absolute operation and management of its business.
ARTICLE XII-NO STRIKES OR LOCKOUTS
It is mutually agreed by the parties to this Agreement that there shall be no strike, lockout, or stoppage of work during the life of this Agreement, and that differences and misunderstandings which *96 may arise between the contracting parties shall be amicably adjusted by and between and parties themselves subject, if necessary, to Company and Union adherence to provisions of Article VII.
14. The 1976-1979 agreement did not contain any provision which by its terms prohibited Acme from subcontracting truck maintenance work. For a period of eight to nine years, Acme routinely subcontracted truck maintenance and repair work. (N.T. 63, 64, 3/24/80). From time to time, the Union had challenged subcontracting through grievances but never chose to take any to the arbitration level. In answering the grievances on this subject over the years, Acme maintained that its subcontracting right was not modified by any contract term. The Union, on the other hand, contended that any subcontracting had been by its grace since it believed it was entitled to the work under the Recognition Article. (N.T. 73-74, 79-80, 3/24/80).
15. The Union proposed in writing a limitation on Acme's past practice of subcontracting work and that proposal was rejected by the company. The company told the Union it would continue its past practice of subcontracting. (N.T. 85-88, 3/14/80).
16. Mr. Carman of Acme is credited that he told the Union during negotiations that there would be no Automain at the Blue Grass facility and that the bakery truck repair work would be done there by Mack Truck, which had a facility next door. (Co. Exhs. 3 and 16).
17. Further, Mr. Carman is credited that he told the Union the reason for not having the Automain at Blue Grass was that it was twenty (20) miles from the existing D.C. 1 facility.
18. Acme further explained that Mack Truck was immediately next door to the new facility and its mechanics were also members of Local 724. Acme orally guaranteed that at no time would any Acme employee, other than those who were members of Local 724, be permitted to perform even minor repairs or maintenance on the bakery trucks at Blue Grass. Acme also guaranteed to the Union that the Acme mechanics at D.C. 1 would not be laid off by reason of the move and assured the Union that Acme would attempt to assign to them more non-bakery truck maintenance work than had been performed there in the past. (N.T. 19, 3/24/80).
19. The Union claims it subsequently responded that if any firm "other than Mack Truck did the work it would automatically come back to the Automain and that Acme made no response to the Union's assertion (N.T. 26, 71, 72, 3/24/80). The Union claims it assumed by Acme's silence or lack of response that Acme agreed to the Union's asserted position on this topic. (N.T. 72, 113-114, 3/24/80).
20. This statement by the Union, assuming it was made, did not constitute a counteroffer, but rather the court finds that it was an assertion that if Acme did not subcontract to Mack Truck but to some other firm the work would be claimed by the Automain pursuant to the Recognition Article of the labor agreement. (N.T. 71, 3/24/80).
21. Even if the statement were made, the court finds that Acme had no obligation in the context of the negotiations to respond to it since it had previously rejected a Union offer which would have restricted its subcontracting of work. Further, the court finds that as of the time of negotiations Acme had decided to subcontract the Blue Grass repair work. It chose Mack Truck because of convenience and because its mechanics were also members of Local 724. Under these circumstances, the court finds the Union's position neither credible nor reasonable that it relied upon Acme's silence as assent to an essential term of the negotiated agreement. Therefore, the court concludes that the statement as to reversion of the work to the Automain was never made by the Union as an offer or counteroffer.
22. During negotiations the Union assumed, without discussion or seeking agreement, that when the bakery fleet was permanently and completely removed to the *97 new location, and it could make a determination of the nature of the work there, it would decide what portion of the repair work it would demand on a permanent basis. (N.T. 19, 3/24/80).
23. The Union further asserts that Acme agreed that Mack Truck would do only minor repair work on the trucks during the transition or interim period.
24. Mr. Carman's testimony is credited that the Union did not propose and Acme did not agree that Mack Truck would do only minor repairs. Minor work was not proposed or agreed upon by the parties as a limitation upon the subcontracting ability of Acme during the bakery transition period. The Union merely assumed that Mack Truck would be doing only minor repair work during the interim period since at the D.C. 1 Automain mechanics were doing the major repair work during the transition period. (N.T. 26, 3/24/80).
25. Part of consideration given by Acme for the Union acceptance of its final contract proposal was a guarantee of no layoffs of Union members who were then on the payroll, and that Acme would not permit any other Acme employee represented by a different Union to do even minor repairs of any nature of the bakery trucks. (N.T. 14, 20, 3/7/80).
26. When the final negotiation session concluded on October 12-13, 1979, the parties used Acme's proposal as a checklist of items agreed upon and each member of the Union negotiating committee was polled by Acme to determine whether he would recommend to the membership the settlement achieved at the bargaining table. Each stated that he would. (N.T. 18, 19, 88-89, 3/14/80). That checklist did not include a provision that the subcontract work would revert to the Automain.
27. The term of the new labor agreement intended by both parties was three (3) years.
28. On the morning of Sunday, October 14, 1979, the Union held a ratification meeting at which time there was acceptance of the negotiated settlement.
29. Mr. Sheck, the Chief Union negotiator, claims that he told the membership that if bakery truck repair work to be done at Blue Grass by Mack Truck on an interim basis was done instead by any other firm, all of the Blue Grass repair work would revert to the Acme Local 724 workers at the Automain. If made, this statement was based solely upon Mr. Sheck's belief that the Recognition Article of the labor agreement gave the Union the right to the repair work in any event and that the Union had the right to reclaim it at any time it chose or whenever it might determine Acme intended to subcontract the work permanently or to some firm other than Mack Truck. (N.T. 72, 3/24/80). This alleged statement to the membership was never communicated to Acme and the ratification was not conditional in any way.
30. Following the Union's communication to Acme of the ratification vote, the company commenced steps to make the increases in benefits and wages effective retroactive to May 27, 1979 as agreed.
31. By letter dated December 26, 1979, Acme sent to Mr. Sheck a "red-line" copy of the collective bargaining agreement. (Co. Exhs. 13 & 14, N.T. 35-36). The "red-line" agreement was a copy of the 1976-1979 agreement, changed to reflect the negotiated settlement.
32. After receiving the red-line document, and prior to the instant labor dispute, Mr. Sheck had six to eight conversations with Mr. Carman, Acme's chief negotiator, and never contended that a collective bargaining agreement as written was not in effect. (N.T. 36, 3/14/80). The Union also knew at the time the membership ratified the company proposal that Acme had subcontracted the bakery fleet work to Mack Truck and that Mack Truck was already doing it.
33. Around February 1, 1980, Mr. Sheck complained to Mr. Carman that he did not believe Acme was bringing in work to be done at Automain. Mr. Sheck accused Acme of permitting Mack Truck to farm out some of the work to firms employing non-Local 724 members. (N.T. 65-67, 71-73, 3/14/80).
*98 34. On February 4, 1980 the Union informed Acme that if Mack Truck did anything other than minor maintenance work on the bakery fleet, the Union would shut Acme down. (N.T. 41-42, 3/7/80).
35. In the afternoon of February 4, 1980, the Union threatened that if anybody did any work on the Acme fleet other than Acme 724 people, the Union would shut Acme down within 48 hours. (N.T. 42, 3/7/80).
36. On February 6, 1980, the Union advised that its membership on February 5, 1980 had voted to go on strike over the issue at midnight on Thursday, February 7, 1980 and that the Union had the support of other unions who represented other Acme employees. (N.T. 44, 3/7/80).
37. As of October 14, 1979, there was in force a valid collective bargaining agreement between Acme and the Union.
38. A strike by the Union would violate the "no strike" clause of the collective bargaining agreement and would cause irreparable harm to Acme if not enjoined, including, interruption of maintenance of fleet of trucks, endangering the supply and transportation of Acme's products from the warehousing and distribution centers to the stores, and depletion of the store's supplies, all causing Acme loss of customers. (N.T. 49-51, 3/7/80).
39. The question of whether Acme violated the collective bargaining agreement by making a permanent assignment of truck maintenance at Blue Grass to Mack Truck is an arbitrable question under the binding arbitration provisions of the collective bargaining agreement.
40. Since there was no work stoppage, Acme has not sustained any damages.

III. DISCUSSION
The dispute between the parties is not whether there was an agreement. The issue is whether Acme has the unfettered right to subcontract work under the terms of the collective bargaining agreement and past practice. This issue is for an arbitrator to resolve, not the court.
During negotiations, Acme never sought the Union's consent to subcontract work to Mack Truck. It took the position that it had the right to do so. The Union offered a written proposal to limit Acme's asserted right to subcontract. This was rejected. Likewise, the Union never relinquished its position during negotiations that the Recognition Article accorded it the right to claim or reclaim any work which Acme might seek to subcontract out. Therefore, the court finds that there was no agreement by the Union acceding to the subcontracting to Mack Truck on a permanent basis. Indeed, the Union admits that at the time ratification, it believed the permanent assignment of the work was left unresolved. Nor does the court find that there was an agreement by Acme conditioning its subcontracting of work to Mack Truck. Both parties had firm, fixed positions on the subject of subcontracting prior to and during negotiations and knowingly did not relinquish either as the result of the negotiations. Neither reasonably expected the other to compromise its position. Both were willing to take their chances on the arbitration process to determine the issue of subcontracting in its favor. The Union's position derived from the Recognition Article which remained unchanged in the new agreement and Acme's position derived from the Management Security Article which likewise remained unchanged. The fact that the Union might not have fully appreciated until a month after ratification that Acme intended to subcontract the truck repair work to Mack Truck permanently as opposed to temporarily was not an essential element of agreement. The Union fully intended to decide, after the fleet was completely moved to Blue Grass, whether to demand the work on a permanent basis. If at that time the Union wanted the work but Acme took the position that the work was permanently assigned to Mack Truck, the Union fully anticipated it would be in the same position as it now finds itself. It would have had to seek redress through the grievance and binding arbitration machinery.
*99 The Union never sought to make the issue of permanent assignment or subcontract of the repair work at Blue Grass an issue of agreement during negotiations. Interim performance of that work by Mack Truck was not an essential element because the Union accepted the notion that Mack Truck was doing the work on a subcontract basis at least until the bakery fleet was fully relocated. Mack Truck is an entity separate and distinct from Acme and there is no evidence that Acme controls the Union affiliation of Mack Truck's employees or the selection of Mack Truck's parts suppliers or its subcontractors. The Union's argument that it understood that only Mack Truck would do the repair work is inconsistent with its admission that it knew Mack Truck was a subcontractor. The Union contends that there was an agreed upon remedy of reversion of the repair work to the Automain if any firm other than Mack Truck worked on the trucks. This position is not creditable because the Union, knowing that Mack Truck was a subcontractor, also knew at the time of negotiations that Mack Truck could subcontract its work if it chose. Accordingly, the court finds that Acme did not agree to a return of the work to the Automain as a remedy for breach of the collective bargaining agreement.
The Union argues that there was an agreement to that effect by reason of Acme's silence. It is a fundamental legal axiom that, generally, an offeree need not make any reply to an offer and that silence and inaction cannot be construed as an assent. Beach v. United States, 226 U.S. 243, 259, 33 S.Ct. 20, 26, 57 L.Ed. 205 (1912); Baltimore and L. Ry. Co. v. Steel Rail Supply Co., 123 F. 655, 661 (3d Cir. 1903); Dorton v. Collins & Aikman Corp., 453 F.2d 1161, 1166 (6th Cir. 1972). It is true that under special circumstances, an offeree's silence may be construed as an acceptance of the offeror's offer, such as where the offeree had a duty to respond and the offeror under the circumstances was justified in expecting a reply if rejection was intended. 1 Williston On Contracts § 91 (1957). However, not only are such special circumstances absent here but there is no evidence through the Union that the alleged statement was intended as an offer or counteroffer during negotiations. If the statement was made, it was merely a restatement of the Union's position that it could demand all the repair work at any time under the authority of the Recognition Article. This was an oft stated position of the Union which was part of its long standing posturing on the subject of subcontracting, a subject which each party claims should be resolved in its favor under the adopted terms of the old agreement. Under all the circumstances, the court concludes that Acme had no duty or reason to respond to the Union's alleged statement during negotiation.
Crediting the Union Chief negotiator, Mr. Sheck, that he said to the Union membership that if any firm, other than an employer of Local 724, did interim repair work that work would revert to the Automain, it reflected, at best, his personal assurance that the Union could, through the Recognition Article, gain control of the repair work at Blue Grass. Ratification of the negotiated settlement was not conditional. Nor was there any post-ratification evidence given by the Union of dissatisfaction with Acme's written summary of the agreed upon items and contract language.
The instant dispute arose only after the Union realized that the bakery fleet had been permanently reassigned to Blue Grass and fully appreciated Acme's decision to subcontract the work on a permanent basis to Mack Truck. The interim or transition period was then over. Whatever may have happened during that interim period was moot and irrelevant to the prospective rights of the parties under the agreed terms of the collective bargaining agreement. Based upon their collective bargaining history, arbitration is precisely where the parties knew they would be should a material dispute have arisen over the subject of Acme's claimed right to subcontract work.
For the above reasons, the court concludes that there was a ratified collective bargaining agreement as stated by Acme, *100 and that agreement did not include any oral agreement covering reversion of subcontracting as alleged by the Union. The final ratified agreement included that guarantee that no Acme Local 724 employee then on the payroll would be laid off and that no Acme employee represented by a Union other than Local 724 would do repair work on the bakery trucks at Blue Grass. The court finds that the dispute over Acme's right to subcontract is arbitrable under the terms of the binding arbitration provisions of the collective bargaining agreement. Arbitration shall be ordered.

IV. CONCLUSIONS OF LAW
1. The question of whether there exists a collective bargaining agreement between Acme and the Union is an issue properly determined by this court. Controlled Sanitation Corp. v. Machinists, 524 F.2d 1324 (3d Cir. 1975).
2. Any question concerning a dispute about any term or provision of a collective bargaining agreement which contains a mandatory and exclusive grievance procedure may be resolved only through the collective bargaining agreement's grievance procedure. Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403, 46 LRRM 2414 (1960); Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, 46 LRRM 2416 (1960).
3. There may exist an enforceable collective bargaining agreement notwithstanding that said agreement is an oral agreement between the parties. Roadway Express v. Teamsters Local 249, 330 F.2d 859, 56 LRRM 2085 (3d Cir. 1964).
4. There was no oral agreement on the subject of reversion of interim subcontracting of fleet repair work as alleged by the Union.
5. Acme and the Union mutually assented to a collective bargaining agreement which was ratified by the Union membership. There exists an enforceable collective bargaining agreement between the parties.
6. The current dispute between Acme and the Union concerns terms of the collective bargaining agreement and involves the question of whether Acme can subcontract maintenance and repair work to Mack Truck on a permanent basis. This is question to be adjudicated through the collective bargaining agreement's mandatory and binding grievance procedure. Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403, 46 LRRM 2414 (1960); Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, 46 LRRM 2416 (1960).
7. An alleged breach of a collective bargaining agreement does not give the aggrieved party the right to repudiate or rescind the collective bargaining agreement. Steelworkers v. NLRB, 530 F.2d 266 (3d Cir. 1976).
8. The Union's threatened strike on February 7 was over an arbitrable dispute and in violation of an enforceable "no strike" clause. Boys Markets, Inc. v. Retail Clerks, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199, 74 LRRM 2257 (1970).
9. If the Union is not enjoined from striking, Acme will suffer immediate and irreparable harm.
10. Inasmuch as there was no evidence of a work stoppage, there are no damages awardable to Acme.
Accordingly, an appropriate Order shall be entered.

ORDER
AND NOW, this 7th day of July, 1980, it is hereby ORDERED that:
1. The Union is hereby enjoined from striking over the labor dispute which is arbitrable under the terms of the collective bargaining agreement.
2. The Company is directed to submit the dispute to binding arbitration as a condition of continuance of this injunctive relief.
3. Since no monetary damages have been sustained by either party, the complaint is hereby DISMISSED, without prejudice *101 to the right of either party to seek enforcement of this Order.