EASTERN AIR LINES, INC.,
Plaintiff–Appellant,

v.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and Larry D. Schulte, Defendants–Appellees.

No. 87–5978.

United States Court of Appeals,
Eleventh Circuit.

Dec. 27, 1988.

Michelle L. Gilbert, Michael J. Madigan, Richard L. Wyatt, Jr., Washington, D.C., for plaintiff-appellant.

James L. Linsey, Cohen, Weiss & Simon, Stephen Presser, New York City, Jonathan A. Cohen, Air Line Pilots Ass'n, Washington, D.C., for defendants-appellees.

Before KRAVITCH and EDMONDSON, Circuit Judges, and HOFFMAN *, Senior District Judge.

KRAVITCH, Circuit Judge:

This labor-contract dispute between an airline and its pilots' union came before the district court on cross-motions for summary judgment. The court granted the motion of defendants Air Line Pilots Association, International and Larry D. Schulte, the chairman of the governing body of the association's local (collectively, "ALPA"), and denied the motion of plaintiff Eastern Air Lines, Inc. (Eastern). *Eastern Air Lines, Inc. v. Air Line Pilots Association, Int'l,* 670 F.Supp. 947 (S.D.Fla.1987). We now affirm.

## I.

Eastern and its unions together faced a serious dilemma in the early weeks of 1986. Eastern's above-industry labor costs contributed substantially to its deteriorating financial condition, and the airline realized that if it could not reduce those costs by securing wage concessions from ALPA, the machinists' union, and the flight attendants' union, it would be compelled to opt either for bankruptcy or loss of its independence. Neither alternative appealed to Eastern or to its pilots, who were then engaged in rocky negotiations with the carrier over a new collective-bargaining agreement. While an agreement with ALPA alone would not prevent a sale or bankruptcy, the lack of a contract would probably cause one or the other, and would leave the pilots unprotected after such an event occurred. Reaching some sort of agreement was thus of critical importance to both parties.

Collective-bargaining negotiations between Eastern and ALPA, under the eye of the National Mediation Board (NMB), began in December of 1985. In late January 1986, after an impasse, the NMB declared a mandatory thirty-day "cooling off" period under the Railway Labor Act (RLA), after which both the pilots and the carrier could engage in "self-help." Self-help for the pilots entails striking the airline; the airline avails itself of self-help by unilaterally implementing the terms of its final offer. The cooling-off period was to end on February 26.

Intense negotiation continued during the cooling-off period. In the final days of the period, Eastern was approached by a potential suitor, the Texas Air Corporation. Eastern seriously considered accepting Texas Air's offer if it could not resuscitate itself by slashing its labor costs. The offer was due to expire at midnight on February 23, 1986, yet by the 23rd, Eastern and ALPA had not been able to agree to a new contract.

Compounding the external pressure to reach an agreement imposed by the potential of a sale or bankruptcy, the pilots voted on February 21 to strike the airline at the end of the cooling-off period. On February 23, then, the negotiating parties began to work feverishly in the face of the looming

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

deadline, while Texas Air apparently agreed to extend its offer for a few more hours. Wide areas of disagreement still separated the parties.

Sometime in the evening of February 23, ALPA requested Eastern's final offer, and to the ALPA team Eastern offered "EAL No. 7," a handwritten four-page document peppered with "buzzwords" and loose phrases. The terms of EAL No. 7 summarized concepts that the negotiating parties had been discussing over the course of the talks. After some inconclusive haggling, ALPA negotiators submitted the document to the Eastern Air Lines Master Executive Committee (the "MEC"), ALPA's local governing body, without recommending that the draft be ratified. The MEC questioned its negotiators about various provisions of the document, and the negotiators, aware that they did not completely understand EAL No. 7, were not able to answer every question posed them. The MEC initially rejected EAL No. 7. Then, in the early hours of February 24, informed that it would have to ratify the document or steer Eastern toward bankruptcy or toward a sale, the MEC ratified. Following the ratification, Eastern tendered EAL No. 7 for the signature of the relevant ALPA officials, who then signed the document. Eastern's officials had already signed EAL No. 7. Eastern's vice president then substituted the word "AGREEMENT" for "PROPOSAL" as the title of the document. On February 25, Eastern and ALPA executed a signature page in blank.

Despite the apparent success in reaching an agreement with ALPA, Eastern was unable to reach an agreement with its machinists' union. Eastern was therefore sold to Texas Air on February 24.

The negotiating committees disbanded and the NMB mediator left, later stating that the "dispute has been settled by an agreement reached through mediation." ALPA called off its plans to strike the airline. Eastern subsequently announced to the media, to Texas Air, to its employees, and to federal regulatory agencies that a fully binding collective-bargaining agreement had been reached with ALPA and that a pilot strike had been averted. On March 2, 1986, the airline began to implement the concessionary terms of EAL No. 7, including a twenty per cent pay cut.

From the end of February, the parties attempted to flesh out the terse phrases contained in EAL No. 7. As early as February 25, if not sooner, the parties realized that certain important terms were unclear. While they never were able to agree on precise definitions for six key terms,[1] other parts of the agreement were not in dispute, and over the first few months of 1986 Eastern and the union processed some fifty grievances under non-contested portions of EAL No. 7.

ALPA later learned that Eastern planned to grant pay increases to certain non-contract employees. Believing that such increases violated the pay-parity term of EAL No. 7, ALPA filed a grievance on May 27, 1986, with the Eastern Air Lines Pilots System Board of Adjustment (SBA), the arbitral panel responsible under the RLA for adjudicating disputes arising out of the labor contracts between Eastern and its pilots. 45 U.S.C. § 153, Second. The specific content of the pay-parity term—which states, "Parity—with IAM, TWU, non-contract for general across-the-board salary increases only"—has never been defined by the parties.

Eastern filed this action in federal district court in June of 1986 praying that ALPA be enjoined from "attempting to alter or otherwise change the rates of pay as presently contained in an existing Collective Bargaining Agreement between [the]

---

**1.** The disputed terms are the following:
 1. Scope–B/B with Commuter Side Letter
 2. LPP's & Takeover Similar to TWA—need to work out between EAL/ALPA legal counsel
 3. Eliminate Pseudo Contributions to "A" Fund "B" Fund 9% 1986 and 1987 Current pilots 10% 1988 & thereafter 3% pilots hired after 3/2/86 & thereafter

 4. Corporate Dental & Health care proposal
 5. Parity—with IAM, TWU, non-contract for general across-the-board salary increases only
 6. Supermarket Section 28 bid—Future date to be determined
 The parties have agreed to shelve their differences over the "supermarket" provision.

parties ... and to further restrain and enjoin [ALPA] from attempting to invoke the services of the Eastern Air Lines Pilots System Board of Adjustment...." Eastern appended a wage scale to its complaint, but made no reference to the pay-parity term of EAL No. 7.

In July, prior to ALPA's first responsive pleading, Eastern amended its complaint. The amendment alleged that in the event the court should "conclude that the wage rates [appended to the complaint] do not represent the actual wage rates agreed to between [the] parties during the course of the collective bargaining process," then the court should conclude that no "meeting of the minds" occurred in February, and hold that no collective-bargaining agreement exists. Eastern also alleged in its first amendment that the February negotiations

> were based upon the premise and precondition that to be binding upon the parties such negotiations would lead to an integrated and all inclusive new agreement covering all aspects of wages, rules and working conditions that would govern the employment of pilots in the service of Eastern. If the parties could not reach such an integrated and all inclusive arrangement, then no valid or enforceable collective bargaining agreement could result from the negotiations.

In August, ALPA attempted to invoke adjustment-board procedures to resolve three more disputes under EAL No. 7, concerning the "labor protective" term, medical and dental benefits, and "pseudo" contributions to the pilots' retirement plan. In September, Eastern again amended its complaint, and alleged that

> Contrary to the assertions of [ALPA], no agreement presently exists between ALPA and Eastern with respect to any of the matters referred to above. On the contrary, these and other matters have been the subject of ongoing, but to date unsuccessful collective bargaining negotiations upon which no agreement has been reached between these parties.

Eastern asked the court for "a judgment declaring that no agreement presently exists between [Eastern] and [ALPA] with respect to those matters over which defendants now seek to invoke grievance and arbitration proceedings...."

## II.

Initially we must determine whether the district court correctly concluded on summary judgment that the parties entered a collective-bargaining agreement on February 24, 1986. If the parties did form a collective-bargaining agreement, we must consider whether the RLA mandates arbitration or negotiation of their current differences. Review is plenary, guided by the same legal criteria employed by the district court, set out in Rule 56 of the Federal Rules of Civil Procedure and the relevant cases. *See Federal Savings and Loan Insurance Corp. v. Haralson*, 813 F.2d 370, 374 (11th Cir.1987). Summary judgment is appropriate only if, viewing the facts and inferences drawn from the facts in the light most favorable to Eastern, there is no genuine issue as to any material fact and ALPA is entitled to a judgment as a matter of law. *Warrior Tombigbee Transportation Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983).

## III.

■ Labor relations between air carriers and their employees are governed by the Railway Labor Act,[2] enacted in 1926 in response to decades of wasteful labor-management unrest in the transportation industry. *Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429, 107 S.Ct. 1841, 1850, 95 L.Ed.2d 381 (1987). Central to the complex processes of the RLA is the parties' duty "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes ... in order to avoid any interruption to commerce or to the operation of any carrier

---

**2.** Air carriers and their employees were made subject to the Railway Labor Act in 1936. 45

U.S.C. §§ 181 & 182.

growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152, First; *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–78, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).

The question of contract formation under the Railway Labor Act does not involve problems of statutory interpretation unique to the plan of the RLA; we may therefore refer to the law developed over the last half-century "administering our most comprehensive national labor scheme, the National Labor Relations Act," 29 U.S.C. § 151 *et seq. Jacksonville Terminal*, 394 U.S. at 383, 89 S.Ct. at 1118; *Balzeit v. Southern Pacific Transportation Co.*, 569 F. Supp. 986, 988 n. 5 (N.D.Cal.1983). As under the National Labor Relations Act, our resolution of this contract-formation dispute is guided by the general common law of contracts. *See Warrior Constructors, Inc. v. Int'l Union of Operating Engineers, Local Union No. 926*, 383 F.2d 700, 708 (5th Cir.1967).[3] In light of the important federal policy favoring the existence of collective-bargaining agreements, however, contract law may be given a liberal interpretation. *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550, 84 S.Ct. 909, 914–15, 11 L.Ed.2d 898 (1964); *Trustees of the Atlanta Iron Workers, Local 387 Pension Fund v. Southern Stress Wire Corp.*, 724 F.2d 1458, 1459 (11th Cir. 1983).

The district court determined that Eastern and ALPA both displayed an objective intent to be bound by EAL No. 7, and concluded that EAL No. 7 was in fact a collective-bargaining agreement. 670 F.Supp. at 952–53. *See National Labor Relations Board v. Haberman Construction Co.*, 641 F.2d 351, 356 (5th Cir. Apr. 3, 1981) (en banc) (labor contract can be adopted by conduct manifesting an intention to abide by the terms of an agreement). Objective factors considered by the district court included (1) the parties' past bargaining history, (2) whether the alleged agreement was reduced to a writing, (3)

whether the alleged agreement was ratified by the union and signed by the employer, (4) whether the parties implemented the alleged agreement and subsequently operated under its terms, and (5) whether the parties expressed an intent to adopt a contract and to conclude collective-bargaining negotiations once the alleged agreement was adopted. 670 F.Supp. at 952. *See Bobbie Brooks, Inc. v. International Ladies' Garment Workers Union*, 835 F.2d 1164, 1167–70 (6th Cir.1987); *Warehousemen's Union Local No. 206 v. Continental Can Co., Inc.*, 821 F.2d 1348, 1350 (9th Cir.1987); *Garrett Railroad Car & Equipment, Inc. v. N.L.R.B.*, 683 F.2d 731, 735–37 (3d Cir.1982); *Acme Markets, Inc. v. International Association of Machinists and Aerospace Workers, Local Lodge No. 724*, 506 F.Supp. 92, 94 (E.D.Pa.1980).

We agree with the district court that the objective behavior of ALPA and Eastern following the signing of EAL No. 7 clearly indicated that the parties considered themselves bound by a collective-bargaining agreement. Indeed, Eastern states in its briefs before this court that, after February 24, it "believed" the parties had concluded an agreement.

Eastern contends, however, that the district judge applied an erroneous legal test. Eastern argues that the district court failed to acknowledge evidence that the parties had "widely disparate understandings of the cryptic phrases in EAL No. 7," and that "the court decided that since the parties initially believed and acted in accordance with the assumption that an agreement had been reached, then by definition, a contract existed." Therefore, according to the airline, "the lower court ... 'begged' the ultimate question when it assumed that Eastern's labeling of the document as an 'agreement' and its initial announcement that an 'agreement' had been reached meant that there had been a meeting of the minds...." Eastern submits that the correct test accords prime consideration to the subjective understanding of

---

**3.** *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc). The Eleventh Circuit, sitting en banc, adopted as binding precedent all decisions rendered prior to October 1, 1981, by the former Fifth Circuit.

each party: whether there was "a meeting of the minds" on all material contractual terms; whether the parties "mutually assented" to each term of EAL No. 7.

"Mutual assent" is important, and lack of "mutual assent" over a "material" term will void a contract in certain situations.[4] But "[a]lmost never are all the connotations of a bargain exactly identical for both parties...." Restatement (Second) of Contracts § 20 comment b (1979). Therefore a party cannot show lack of "mutual assent" merely by pointing to areas of disagreement under previously adopted language. See Continental Can, 821 F.2d at 1351; United Steelworkers of America v. Logan Park Care Center, Inc., 634 F.Supp. 182, 184 (S.D.W.V.1986). Cf. Restatement, supra, at § 20 comment b ("material differences of meaning are a standard cause of contract disputes"). Otherwise, labor contracts would be voidable any time they contained language reasonably susceptible of two different interpretations.

Furthermore, the fact that two parties did not agree on all substantive terms at the time of contracting does not void the contract as a matter of course—parties can agree to dispense with agreement over the precise content of a particular substantive term. That term of the contract is then no longer the "material" term; rather, the provision that is "material" is the actual agreement to postpone resolution of the substantive term. Thus, the agreement to dispense with "mutual assent" over a given term is itself a product of "mutual assent." For example, in Robbins v. Lynch, 836 F.2d 330, 331 (7th Cir.1988), the employer executed a promise to be bound by any agreement thereafter concluded by multiunion and multiemployer bargaining associations. See also Bobbie Brooks, 835 F.2d

at 1168 ("parties can form a binding agreement which they intend to be final, despite leaving certain terms open for future negotiation"); Washington Heights–West Harlem–Inwood Mental Health Council, Inc. v. District 1199, National Union of Hospital and Health Care Employees, 748 F.2d 105, 108 (2d Cir.1984) (parties may have reached an oral understanding on a successor collective-bargaining agreement, even though there might not have been a meeting of the minds on all the details of that agreement); Capitol–Husting Co., Inc. v. N.L.R.B., 671 F.2d 237, 242 (7th Cir.1982) (company agreed to match whatever terms the union was able to secure from other employers). Cf. United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 580, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960) ("Because of the compulsion to reach agreement and the breadth of the matters covered, ... the product of negotiations ... is, in the words of the late Dean Shulman, 'a compilation of diverse provisions: some provide objective criteria almost automatically applicable; some provide more or less specific standards which require reason and judgment in their application; and some do little more than leave problems to future consideration with an expression of hope and good faith.' " (quoting Shulman, Reason, Contract, and Law in Labor Relations, 68 Harv.L.Rev. 999, 1005 (1955)).

Therefore, the fact that Eastern currently claims wide areas of difference in the interpretation of six important terms is not, of itself, sufficient to support a finding of no contract. Here, as noted by the district court, the outward indicia of agreement point indisputably to a contractual arrangement. Yet in the "meeting of the minds" cases cited by Eastern, with the exception

---

4. See Restatement (Second) of Contracts § 20 (1979). For example, where one party steadfastly seeks agreement over a specific term, and the party seeking to enforce the contract knew or should have known that such an agreement was never reached, the contract will not be enforced. See National Labor Relations Board v. Downs–Clark, Inc., 479 F.2d 546 (5th Cir. 1973) (company insisted on merit-pay term; union sought to compel company to sign agreement that contained no such term; court re-

fused to find contract, holding "no meeting of the minds on the key issues of wages and merit increases"; id. at 548). Lack of mutual assent can also void a contract in a case of mutual mistake. See Waldon, Inc. v. International Association of Machinists and Aerospace Workers, 282 N.L.R.B. 82 (1986) (discussed infra text). Of course, the party seeking to avoid an obligation could also show that he never contemplated an agreement at all. See Caporale v. Mar Les, Inc., 656 F.2d 242 (7th Cir.1981).

of a "mistake" case,[5] the parties did not both believe for any substantial period of time that a binding collective-bargaining agreement had been reached; there was thus no objective manifestation of an intent to be bound; and so there was no basis (save one party's assertion) for finding a contract.[6]

Eastern claims, in effect, that Eastern and ALPA were *mistaken* as to each other's understanding of the substantive terms of the contract:

> In this case, the parties discovered that they had no meeting of the minds as they attempted to draft an integrated document. It was only when the post-February 24 negotiations failed to yield an agreement, that the union sought to by-pass the bargaining table by filing for arbitration. Most significantly, ... in this case the bargaining history reveals that Eastern would never have—and *could* not have—agreed to the terms that ALPA insists it had agreed upon. ALPA's witnesses have likewise sworn that ALPA would not have agreed to Eastern's terms. Consequently, the parties must have had different understandings at the time the purported "agreement" was reached.

Yet Eastern has neither pleaded nor proven a mistake claim, such as, for example, *Waldon, Inc. v. International Association of Machinists and Aerospace Workers*, 282 N.L.R.B. 82 (1986). In *Waldon*, a union representative involved in contract talks erroneously transcribed management's proposal on wage grades. Management had verbally listed a "Grade IA" classification, which would have resulted in six wage-grade classifications, but the union repre-

sentative created and relayed to the rank-and-file a schedule with only five classifications, Grades I–V. The union representative acknowledged having seen a copy of the correct wage-grade schedule, which apparently was similar to the schedule already in use, but he testified that such a schedule "did not make sense as there were no employees in Grade IA classification and many of the actual wages of the employees were above the top of the range for their classification." The union ratified a contract with five wage-grade classifications. The mistake was not discovered until several weeks later, when the company informed the union of a "clerical error" in the contract.

The administrative law judge concluded that the union representative "was mistaken in his understanding of [management's] offer and in what he took back to the membership for ratification." The ALJ further credited a manager's "testimony that he did not discover the error until it was called to his attention" by the company controller.

Accordingly, the ALJ concluded "that the [union] through [the representative's] error ratified a different wage proposal than that offered by [management], resulting in a mistake over an essential element of the contract. There was, thus, no meeting of the minds over this essential element of wages and there was, thus, no valid contract."

In *Waldon*, then, the parties did not intend to sign a contract with a disputed wages term. Their reasonable mistake in doing so resulted in a voided contract. From a review of the summary-judgment papers in the present case, by contrast, we

5. *Waldon, Inc. v. International Association of Machinists and Aerospace Workers*, 282 N.L.R.B. 82 (1986) (discussed *infra* text).

6. *E.g., United Food and Commercial Workers Union, Local No. 304A v. N.L.R.B.*, 772 F.2d 421 (8th Cir.1985) (company never agreed or indicated agreement with terms of union's proposed contract); *Caporale v. Mar Les, Inc.*, 656 F.2d 242 (7th Cir.1981) (employer consistently denied having entered collective-bargaining agreement); *National Labor Relations Board v. New York–Keansburg–Long Branch Bus Co., Inc.*, 578 F.2d 472 (3d Cir.1978) (company refused to exe-

cute agreement because parties never reached full agreement on three issues); *National Labor Relations Board v. Downs–Clark, Inc.*, 479 F.2d 546 (5th Cir.1973) (company never changed its position on a key term; steadfastly refused to agree that the union's draft represented a collective-bargaining agreement); *Independent Union of Flight Attendants v. Pan American World Airways, Inc.*, 624 F.Supp. 64 (E.D.N.Y.1985) (after parties signed memorandum of understanding, dispute flared next day; company never claimed agreement had been reached).

find it implausible that the parties, while asserting the existence of a contract, were mistaken in a belief they had agreed on a precise definition for each important term.

Eastern attempts to ward off summary judgment by arguing that its chief negotiator "believed the ALPA negotiating committee understood the material terms of his offer." This argument is irrelevant considering the parties' behavior after they signed EAL No. 7. For even if the parties thought that they had all disagreements squared away upon signing the document, which seems unlikely,[7] uncontradicted evidence shows that Eastern was actually aware of disagreements over definitions shortly after signing EAL No. 7. Eastern nonetheless professed for several months to have a collective-bargaining agreement with its pilots, and never attempted to engage in self-help or formal collective-bargaining negotiations.

Eastern's chief negotiator stated during deposition that he became aware of disagreements over the pay-parity term on February 25. Even if this employee's knowledge of the disagreement is not imputed to the rest of the organization, however, Eastern's entire management was indisputably aware of the differences at least as early as the first weeks of March. Quoting Eastern:

> In an attempt to resolve some of the parties' differences, on March 12, 1986, the negotiating committees held a formal meeting, during which disagreements over LPPs and parity were discussed.... These subsequent exchanges of contract language and meetings to resolve differences, therefore, were not simply a "mechanical drafting" as ALPA has alleged.

Instead, these facts, which ALPA has again ignored, demonstrate that the parties had never reached a mutual understanding of material terms.

Despite this plain knowledge of disagreement, Eastern continued to affirm the existence of a collective-bargaining agreement. On March 11, for example, the NMB informed Eastern that it was closing its file on the ALPA–Eastern negotiations because the "dispute has been settled by an agreement reached through mediation." An internal memorandum stated that "no reply [was] necessary" to the NMB's determination, and no Eastern official ever objected to the NMB's decision to close the ALPA–Eastern collective-bargaining proceedings. Moreover, as late as August 1986, Eastern advised its pilots that "beginning with your third occurrence of sick leave ..., you will receive 80% pay and credit under the terms and conditions of Section 38 of the Agreement signed February 23, 1986." Even in its initial complaint, Eastern asserted that the parties had a collective-bargaining agreement. Indeed, we see no evidence that Eastern ever suggested no collective-bargaining agreement existed until its lawyers amended the complaint in the instant action, in July of 1986.

Therefore, we see a plain course of conduct after the signing of EAL No. 7 that evinces an intent to be bound by a contract notwithstanding disagreements over certain of its terms. Both parties were aware of disagreement over the interpretation of some contractual language, yet both parties continued to claim that an agreement had been reached. Our conclusion that the parties agreed that their collective-bargain-

---

7. Indeed, in its memorandum in support of summary judgment, Eastern stated that "[t]he six material provisions on which the parties have never reached agreement are indisputably vague on their face and obviously reference only generalized concepts." Eastern also points out that "[n]ormally, parties contend that there was no meeting of the minds over only one item or minor details. Eastern is aware of *no* case when the number of disputed items are as large in this case [sic] or where the dollar impact of the misunderstandings is so significant." If the parties had such large-scale disagreements over important terms at the time of contracting, it

seems likely that both sides were aware of the lack of understanding when they signed the agreement. Eastern contends to the contrary. The facts of this case do not require us to decide whether Eastern's asserted lack of awareness was reasonable, or, if it were not, whether an unreasonably held belief that the parties agreed on all terms should prevent Eastern from later denying the contract on the basis of the disagreements. On a motion for summary judgment, with an underdeveloped record, we hesitate to delve too deeply into the reasonableness of a belief that we must accept as honestly held for the purposes of Rule 56.

ing contract would not explicitly resolve problems of interpretation is practically inescapable. This agreement is part of their labor contract;[8] the lack of clarity in the six disputed terms is thus irrelevant to the question of "mutual assent."

Eastern, however, contends that "[b]ecause the parties had agreed early on that there would be no agreement on any item until the parties had reached agreement on every item, the failure to reach agreement on these six items requires a conclusion that no contract was in fact ever reached." Although this argument is appealing, we dismiss it for two reasons. First, Eastern offers no limit to the drastic power it ascribes to the all-or-nothing rule. There is no good reason to believe that the parties intended this ground rule to mean that if *any* disagreement *ever* arose concerning the interpretation of a term, the entire contract would be called off. Moreover, the parties did reach at least partial agreement on the content of the six disputed terms. For example, the parties agreed that the pilots would have "LPP's & Takeover Similar to TWA—need to work out between EAL/ALPA legal counsel."

Second, even if Eastern convinced us that the parties did not, as an original matter, intend to conclude an agreement until each and every detail, speaking to any potential future fact situation, were dickered over and documented, we would easily find that the parties knowingly waived such a condition when they signed the barebones EAL No. 7 and continued to affirm its existence. For, as we have concluded, the parties did not believe that they signed a contract free of ambiguity containing explicit instructions for the harmonious resolution of all pilot-labor problems that might arise during the life of the agreement.

## IV.

Having found an "agreement" for the purposes of the RLA, we must now characterize the parties' present disagreements in order to determine whether those differences may be resolved through nonbinding mediation or whether they must be submitted to the Eastern Air Lines Pilots System Board of Adjustment.

Disputes during the process of negotiation and formation of an RLA collective-bargaining agreement are labeled "major." Major disputes "arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). After an agreement is reached, and the parties differ over the interpretation of various terms in the agreement, their disputes are labeled "minor."[9] A minor dispute "relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Id.* These terms of art are not perfectly descriptive: a minor dispute may indeed have grave import for the interests of the parties. *See Aaxico Airlines, Inc. v. Air Line Pilots Assoc., Int'l*, 331 F.2d 433, 437 (5th Cir.), *cert. denied*, 379 U.S. 933, 85 S.Ct. 334, 13 L.Ed.2d 344 (1964).

The major/minor distinction determines the process by which a dispute is resolved. Major disputes are settled through negotiation in the shadow of the potential for union or carrier self-help. *See Jacksonville Terminal*, 394 U.S. at 384, 89 S.Ct. at 1118. Minor disputes are settled through compulsory binding arbitration and self-help is forbidden. *Brotherhood of Railroad Trainmen v. Chicago River and Indiana R.R. Co.*, 353 U.S. 30, 34, 77 S.Ct. 635, 637, 1 L.Ed.2d 622 (1957).

---

8. Note that collective-bargaining agreements need not be written in order to be enforceable. *E.g., National Labor Relations Board v. Haberman Const. Co.*, 641 F.2d 351, 355–56 (5th Cir. 1981) (en banc).

9. The terms "major" and "minor" are not part of the statutory scheme. "Major" disputes are described in 45 U.S.C. § 151a(4): "disputes con-

cerning rates of pay, rules, or working conditions;" "minor" disputes are described in § 151a(5): "disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." *See Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 722, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945).

Specific language in EAL No. 7 speaks to each area of difference pleaded by Eastern; resolution of these disputes will involve inquiry into "the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Elgin*, 325 U.S. at 723, 65 S.Ct. at 1290. The district court therefore properly labeled the disputes "minor." 670 F.Supp. at 953. They must now be arbitrated in accordance with the provisions of the Railway Labor Act.

Anticipating our direction to submit to the SBA the construction of the disputed terms, Eastern argues that

> In deciding this "grievance" the arbitrator will have before it only the cryptic reference to pay parity in the four-page document and therefore, will be forced to decide the terms of the parties' agreement. In effect, ALPA has forced Eastern to submit to "interest arbitration" an issue Eastern never agreed to have a third-party decide. Indeed, Eastern expressly rejected interest arbitration in January 1986.

Just as Eastern foresaw some dispute, it also should have realized that under the mandatory arbitration provisions of the RLA, the SBA would be charged with resolving the differences. *See Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 323, 92 S.Ct. 1562, 1565, 32 L.Ed.2d 95 (1972) ("the compulsory character of [arbitration under the RLA] stems not from any contractual undertaking between the parties but from the Act itself"). Eventual submission of these disputes to the SBA was a risk assumed by Eastern and ALPA when they signed EAL No. 7 and continued to affirm it. *Cf. Capitol–Husting*, 671 F.2d at 245 (dissatisfaction with competitor's terms was an inherent risk assumed by the company in its agreement to match such terms; company not being "forced" to adopt terms to which it never agreed).

Evidence before the SBA will include the contract language and the parties' testimony. The SBA will be charged with determining the contours of the disputed provisions; it may be that the parties were actually closer to a mutual understanding of certain terms than the terse language

suggests. Fortunately, the construction of vague and ambiguous contract terms is routine fare for labor lawyers and arbitrators. *See Brotherhood of Locomotive Firemen and Enginemen v. Southern Pacific Co.*, 447 F.2d 1127, 1136 (5th Cir.1971). Additionally, we note that a board of adjustment has a special competence not shared by a federal court that will enable the board wisely to construe language that may appear too vague to even the most intrepid of generalist judges. *Cf. United Steelworkers*, 363 U.S. at 582, 80 S.Ct. at 1352–53.

But if *in fact* resolution of any provision amounts to interest arbitration, this consequence is nothing more than what Eastern could have expected; Eastern would have implicitly accepted on February 24 what it expressly rejected in January 1986. *Cf. Certified Corp. v. Hawaii Teamsters and Allied Workers, Local 996*, 597 F.2d 1269, 1271 (9th Cir.1979) (agreement orally modifiable notwithstanding clause that all modifications must be in writing). Eastern may have been "forced" into accepting an unpalatable form of arbitration, but if that is the case, the agent forcing Eastern's hand was fear of a strike or bankruptcy, not the union's filing a grievance.

AFFIRMED.